839 A.2d 202

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Isaac MITCHELL, Appellant.**

Supreme Court of Pennsylvania.

Argued April 7, 2003.

Decided Dec. 30, 2003.

Louis Theodore Savino, Philadelphia, for Isaac Mitchell, Appellant.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, for the Com. of PA, Appellee.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## *OPINION*

Chief Justice CAPPY.

This is a direct appeal from the imposition of two sentences of death. 42 Pa.C.S. § 9711. On February 22, 1999, Isaac Mitchell, Sr. and his two sons, Isaac, Jr. (Hasan) and Yusef, were tried before a jury, for the murders of Jamika Wright and Derrick Washington. Yusef Mitchell was acquitted of all charges prior to the case being given to the jury. Hasan Mitchell was found not guilty on all counts. Isaac Mitchell, Sr., Appellant herein, was convicted of two counts of first degree murder, possession of an instrument of crime and aggravated assault.[1] After further deliberation the jury found the existence of three aggravating circumstances as to each murder and no mitigating circumstances.[2] Appellant was

---

1. *See, respectively,* 18 Pa.C.S. §§ 2502(a), 907 and 2702.

2. The three aggravating factors found by the jury were 42 Pa.C.S. § 9711(d)(7), in the commission of the offense the defendant created a grave risk of death to another person; (d)(10), the defendant had been convicted of another crime punishable by death or life imprisonment, committed before or at the time of the current offense, and (d)(11), the

sentenced to death on both counts of murder in the first degree. This appeal followed from the imposition of sentence.

Although Appellant does not challenge the sufficiency of the evidence with regard to his convictions for first-degree murder, we are required to undertake an independent review of the sufficiency of the evidence in all capital cases. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard for reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1314 (1995).

In order to sustain a conviction for first-degree murder, the evidence must establish that a human being was unlawfully killed, that the accused did the killing, and that the killing was done in an intentional, deliberate, and premeditated way. 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991). It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of the crime. *Commonwealth v. Smith,* 548 Pa. 65, 694 A.2d 1086, 1088 (1997), *cert. denied,* 525 U.S. 847, 119 S.Ct. 118, 142 L.Ed.2d 95 (1998). The use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90, 95, *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995).

On November 9, 1997, Hasan Mitchell and Montrell Washington were among a group of individuals that attended a professional basketball game in Philadelphia. After the game, Hasan and Montrell returned to the neighborhood where Hasan lived, at Montrose Street and Hall Place in Philadelphia, Pennsylvania. Montrell had previously lived in the same

defendant had been convicted of another murder, committed before or at the time of the current offense.

neighborhood and returned there after the game to visit some of his relatives. Hasan and Montrell exchanged differing views as to the merits of certain basketball players. The exchange of opinions became heated and Montrell slapped Hasan. Before the two men became further engaged in a physical dispute, friends intervened to separate them, and Montrell walked away from the area. Hasan called the Philadelphia police to report the physical encounter between himself and Montrell. A patrol car was dispatched to the scene, and Hasan explained to Officer Revell that Montrell struck him during an argument. As Hasan was not in need of medical attention, the officer explained that the matter would be a summary offense and directed Hasan on how to proceed with a private complaint. The discussion between Hasan and Officer Revell concluded at approximately 9:30 p.m.

About 10:00 p.m. Montrell was returning to his grandmother's house at 321 Hall Place, through the rear yard, when he observed that a small crowd had gathered. Montrell identified his brother Derrick, his cousin Jamika, and Appellant with his sons Yusef and Hasan; there was another man in the crowd who Montrell could not identify. As Montrell approached the group he observed Appellant fire a gun twice in the direction of Derrick. Montrell immediately turned away from Appellant and began to run. As he was running Montrell heard three more gunshots. Montrell was shot in the left shoulder. Montrell turned back towards the direction of the gunfire and saw Jamika lying on the ground and heard her crying. Montrell flagged down a car driven by a friend and was transported to a nearby hospital. The cause of death for both Derrick and Jamika was a gunshot wound to the chest, fired at close range, from the same gun that injured Montrell.

On November 18, 1997 Officer Garland of the Philadelphia police arrested Appellant. At the time of the arrest the officer asked Appellant if he knew why the police were looking for him; Appellant responded, "[y]eah, I got two bodies on me." (Trial Transcript, hereinafter "T.T.", 2/25/99, p. 41). Appellant added that he was glad about the arrest as he had

planned to turn himself in to the police later that day. (T.T., 2/25/99, p. 44).

At trial, Appellant testified that he had gone to 321 Hall Place on the night of November 9, 1997, along with his two sons and his brother, Thomas Mitchell, to talk to Montrell about the earlier incident between Montrell and Hasan. While Appellant was talking to Derrick Washington, Montrell approached through the yard carrying a gun. Appellant turned and ran when he saw the gun. As he was running away, Appellant heard three gunshots. Appellant remained in hiding until his arrest, as he was afraid for his life.

In reviewing the above evidence in the light most favorable to the Commonwealth, as the verdict winner, we find it was sufficient beyond a reasonable doubt to support Appellant's convictions for first degree murder in the deaths of Derrick Washington and Jamika Wright. 18 Pa.C.S. § 2502(a), (d); *Mitchell, supra.*

In turning our attention to the issues raised by Appellant, we note initially that three of the six issues presented in his brief to this court raise questions as to the ineffectiveness of trial counsel. In *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), this court overruled the requirement that claims of ineffectiveness of trial counsel must be raised at the first opportunity or said claims would be deemed waived. *Grant* examined the utility of this approach to ineffectiveness of counsel claims, and concluded that ineffectiveness of counsel claims are at their core collateral claims, and are best pursued through the avenue of post-conviction relief. *Id.* at 738. The new rule announced in *Grant* is retroactive to all cases that were pending at the time it was announced, where a claim of ineffectiveness was properly preserved. However, where a merits disposition of the claim was rendered in the intermediate appellate court or by the trial court, in cases brought on direct appeal, this court will address the claim on the merits. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), 2003 Pa. Lexis 920 (2003). In *Bomar,* also a direct capital appeal, the trial court had conducted a post-trial hearing on the ineffectiveness claims and rendered a merits decision as to

those issues, accordingly; this court proceeded to dispose of the ineffectiveness claims on the existing record rather than refer disposition of the claims to the collateral review process per *Grant. Bomar,* 826 A.2d at 853.

After the trial in this case, Appellant obtained new counsel, who prepared post-trial motions raising several claims of ineffectiveness as to trial counsel's performance. The trial judge died prior to disposition of the post-trial motions and another judge was assigned the case. There is no record of a hearing on post-trial motions. In its opinion, the post-trial court found no merit to any of the claims raised. The issues of ineffectiveness addressed and rejected by the post-trial judge do not exactly correspond to the claims raised by Appellant in his brief to this court.[3] This disparity between the claims addressed by the post-trial judge and those raised in the current brief are not fatal to Appellant's claims as the doctrine of relaxed waiver, when applicable, permits Appellant to raise new claims of error for the first time before this court. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).[4] Rather, the dilemma that is presented by the

---

**3.** In the post-trial opinion, the court briefly set forth and then summarily dismissed the following claims of ineffectiveness of trial counsel:
1) Whether trial counsel failed to fully investigate the facts, to interview and call witnesses who would have exonerated the defendant;
2) Trial counsel was ineffective for failing to request complete discovery;
3) Trial counsel was ineffective for failing to effectively cross-examine the police witnesses;
4) Trial counsel failed to request proper jury instructions; and,
5) Trial counsel failed to request a mistrial on day five of the trial.
In the brief filed in this court, Appellant raises the following claims of ineffectiveness of trial counsel:
1) Did trial counsel provide the appellant with ineffective assistance of counsel by giving him advice so unreasonable that it deprived the Appellant of his right to testify at his penalty hearing?;
2) Was trial counsel ineffective for not calling Appellant's witnesses at the penalty hearing?; and,
3) Was trial counsel ineffective for failing to request complete discovery from the Commonwealth?

**4.** In *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), this court abrogated the doctrine of relaxed waiver prospectively. As Appel-

disparity between the claims that were addressed by the post-trial court in its opinion regarding post-trial motions and the claims raised in the current brief, is how to apply the decisions in *Grant* and *Bomar* to the circumstances of this case. Taking into account the strong preference set forth in *Grant* to postpone review of all ineffectiveness claims to the collateral process, and the limitation of the exception allowed in *Bomar* to consider only those ineffectiveness claims where the lower court conducted a hearing and provided a full consideration of the issue, we believe the claims raised in this case are best left to the collateral stage. Because the post-trial judge in this case was not also the trial judge, he did not have the benefit of observing trial counsel in action, there was no hearing on the allegations of ineffectiveness, and, as noted previously, there are subtle yet important differences in the claims as raised below and as now raised before this court. Accordingly, the allegations of ineffectiveness of trial counsel are dismissed without prejudice. *Grant*, 813 A.2d at 739.

We now turn to the remaining issues raised by Appellant. First, Appellant asserts that the decision of the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), requires that his sentences of death be vacated as Appellant is mentally retarded. In *Atkins*, the United States Supreme Court barred the execution of criminal offenders who are mentally retarded, finding it to be excessive punishment precluded under the jurisprudence of the Eighth Amendment. 536 U.S. at 321, 122 S.Ct. 2242. In reaching its conclusion, the majority in *Atkins* relied upon evolving societal views of mentally retarded persons. *Id.* at 315–316, 122 S.Ct. 2242. When looking at the deficiencies of the mentally retarded person in conjunction with the stated purposes of capital punishment—retribution and deterrence—the court concluded that mentally retarded individuals should categorically be excluded from execution. *Id.* at 319, 122 S.Ct. 2242 (*referencing, Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (retribution and deterrence were

lant's brief in this case predated *Freeman*, the doctrine of relaxed waiver is applicable.

identified as the social purposes served by the death penalty)). Although mentally retarded individuals are capable of differentiating between right and wrong, due to their subaverage intelligence and limited adaptive skills, they often fail to learn from their experiences, or learn to control their impulses. *Id.* at 318, 122 S.Ct. 2242. Because mentally retarded persons as a class possess diminished personal culpability for their actions, the concept of retribution, i.e., seeing that the criminal suffers his "just desserts," will not be served by the execution of a mentally retarded defendant. *Id.* at 319, 122 S.Ct. 2242. Deterrence is not an effective method of interaction with mentally retarded persons, as they are not capable of the level of impulse control that is required to calculate the risk attendant to the decision to take a life. *Id.* at 320, 122 S.Ct. 2242. Thus, with no societal purpose served through the execution of a mentally retarded individual, the court held that capital punishment of a person found to be mentally retarded was excessive punishment precluded by the Eighth Amendment. *Id.* at 321, 122 S.Ct. 2242. The determination of how to apply this ban on the execution of mentally retarded defendants convicted of capital crimes was left to the states. *Id.*

Appellant was tried on the above charges on February 22, 1999, a penalty hearing followed immediately upon his conviction of first degree murder, and the jury's sentence of death was formally imposed by the trial court on June 28, 2000. Almost two years later, on June 20, 2002, the United States Supreme Court rendered the decision in *Atkins.* Appellant's brief to this court was filed on October 23, 2002, a scant four months after the decision in *Atkins.* Appellant attempts to bring before this court a claim that he is mentally retarded and entitled to the benefit of the decision in *Atkins,* banning the execution of mentally retarded individuals convicted of capital crimes. As noted above, the United States Supreme Court left to the individual states the task of implementing this new restriction banning the execution of mentally retarded persons.

In order to address the merits of Appellant's individual claim this court would need to develop and adopt universal

standards for carrying out the mandate of the *Atkins* decision in Pennsylvania. Our ability to assess the particular merits of Appellant's claim that he is mentally retarded, and simultaneously to formulate and announce standards on how to put into practice the newly announced constructional ban on the execution of mentally retarded capital defendants, is severely handicapped by the fact that the claim did not exist at the time of Appellant's trial. The current record is devoid of any factual or expert evidence on the issue of whether or not Appellant is mentally retarded, and if he is, what standards were used to classify Appellant as mentally retarded. Further, we are without the benefit of adversarial argument and judicial opinion on the definition of mental retardation and the correct juncture in a capital trial to address the issue of whether a defendant is mentally retarded. This absence of a record is not due to any oversight by trial counsel, or the court below, but simply reflects the fact that at the time of Appellant's trial *Atkins* was not the law of the land.[5]

Appellant attempts to mount an argument that the record supports his *Atkins* claim by relying on the testimony of Doctor Gerald Cooke, a forensic psychologist, who appeared on his behalf at the penalty phase of trial. Appellant points to a portion of Dr. Cooke's testimony wherein the doctor stated that Appellant had too many problems with comprehension and understanding to complete the entire M.M.P.I. test[6] and that Appellant's I.Q. was in the borderline range of intelligence, at 74. (T.T. 3/3/99, p. 29 & 34). From this testimony Appellant argues that a strong presumption that he is mental-

5. At the time of Appellant's trial *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), was in effect, wherein the United States Supreme Court held that the Eighth Amendment ban on cruel and unusual punishment did not categorically prohibit death sentences for mentally retarded criminal defendants convicted of capital murder.

6. The M.M.P.I. is the Minnesota Multiphasic Personality Inventory. It is a psychological assessment designed to aid in the diagnosis of personality disorders. It is comprised of questions which evaluate thoughts, emotions, attitudes, and behavioral traits. The assessment characterizes an individual's personality strengths and weaknesses, and may identify personality disturbances or neurological problems, which cause mental deficits. *John R. Graham, MMPI–2: Assessing Personality and Psychopathology* (3d ed. 1999).

ly retarded exists and that a remand is necessary to give him the opportunity to establish that fact.

The Commonwealth rejects Appellant's interpretation of Dr. Cooke's testimony. The Commonwealth points to another section of Dr. Cooke's testimony wherein the doctor was asked about Appellant's I.Q. and in response he stated:

Some of the sub-tests [I.Q. tests] are affected by education. Some are not. And that's why, when I described to you his verbal I.Q. score, I said actually on day-to-day bases he functions somewhat higher. When we put aside the education, and give him the benefit of the doubt, and calculate the score without those, we get an I.Q. of 80. So still in the ninth percentile. It's still pretty low. But it's not as low as 74.

(T.T. 3/3/99, p. 50–51). From this testimony, the Commonwealth argues that rather than a presumption that Appellant may be mentally retarded, the record shows exactly the opposite: Appellant is of borderline intelligence but has sufficient adaptive skills to function in society on a higher level than his I.Q. would indicate. The Commonwealth rejects the assertion that a remand is necessary to explore the applicability of *Atkins* in this case.[7]

Both Appellant and the Commonwealth attempt to muster persuasive arguments by taking Dr. Cooke's testimony out of the context in which it was presented and rereading it with the

7. According to the accepted definitions of mental retardation, I.Q. is only one factor. The *Atkins* court looked at the definitions of mental retardation provided by the American Association of Mental Retardation and the American Psychiatric Association. *Atkins*, 536 U.S. at 309 n. 3, 122 S.Ct. 2242. As the court noted, the two definitions are similar as they categorize mental retardation in terms of three co-existing criteria: (1) significant subaverage intellectual functioning, (2) accompanied by significant limitations in adaptive skill areas, such as communication, self-care, home living, social skills, community use, self-direction, functional academics, health and safety, leisure and work, and (3) that the mental retardation must occur before age 18. *Id*. These definitions are similar to the definition offered in the Pennsylvania *Mental Health and Mental Retardation Act*: "Mental Retardation means subaverage general intellectual functioning which originates during the developmental period and is associated with impairment of one or more of the following: (1) maturation, (2) learning and (3) social adjustment." 50 P.S. § 4102.

hindsight benefit of the holding of *Atkins.* Despite their best efforts, it is abundantly clear that Dr. Cooke's testimony was specifically intended to support a finding of mitigating circumstances that would make Appellant less likely to receive the death penalty. Dr. Cooke offered his expert opinion that Appellant has a personality disorder, he suffers from both drug and alcohol dependency, and is in the borderline range of intellectual functioning. The issue of mental retardation was touched upon in passing, but it was not the focal point of the testimony of the witness, nor was it a central focus of either direct or cross-examination. It would be injudicious to reach a legal conclusion on the question of mental retardation based on the current record. To prejudge the merits of Appellant's *Atkins* claim based on the limited evidence currently available may create future problems for Appellant in raising this issue in the correct forum, as he may then be faced with a determination that the issue was previously litigated.

Nor do we believe that a remand for an evidentiary hearing at this juncture, is the best possible solution for exploring this claim.[8] The claim that Appellant cannot be executed because after the sentence of death was imposed a

8. The question of mental retardation is of similar degree to the questions of competency to stand trial or insanity that occasionally arise in criminal jurisprudence. Just as in those situations, due process is satisfied by placing the burden of proof on the party attempting to prove incompetency or insanity. *Commonwealth v. duPont,* 545 Pa. 564, 681 A.2d 1328 (1996) (a defendant is presumed competent to stand trial and must prove his incompetency by a preponderance of the evidence); *Commonwealth v. Heidnik,* 526 Pa. 458, 587 A.2d 687 (1991) (a defendant must prove insanity by a preponderance of the evidence). The appropriate measure of proof in such cases is by a preponderance of the evidence. We find this distribution of and standard regarding the burden of proof to be appropriate in cases in which the defendant asserts mental retardation as a complete bar to imposition of capital punishment. *See State v. Williams,* 831 So.2d 835 (La.2002) (a court should make the factual/legal determination that a defendant has met the burden of proving mental retardation by a preponderance of the evidence); *Richardson v. State,* 89 Md.App. 259, 598 A.2d 1 (1992) (the statute barring imposition of the death penalty on mentally retarded persons requires defendant to carry burden of proof by a preponderance of the evidence). It would be unjust to require a litigant to meet this burden on an existing record when the issue he is expected to address did not exist at the time the record in his case was created.

constructional ban on the execution of mentally retarded capital defendants was formulated is a claim challenging the authority of the state to carry out the sentence. Direct review from the judgment of a sentence of death is normally directed at the validity of the legal decisions supporting the underlying conviction or the propriety of the process through which the sentence was achieved. Moreover, this claim will not be lost if review is postponed. If Appellant is mentally retarded the judgment of sentence cannot be carried out. Thus, considering the current state of the record and the importance of the claim itself, we find that this claim is best suited to full review in the collateral stage. 42 Pa.C.S.A. § 9543(2)(vii).

In his second claim, Appellant argues that the trial court erred in permitting the prosecutor to impeach Appellant by reference to his right to remain silent in violation of the prohibition set forth in *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982). Appellant's argument focuses on a series of questions the prosecutor asked of Appellant concerning why Appellant had not previously told police that Montrell was the shooter. Appellant asserts that by permitting this line of inquiry, the court allowed the jury to infer that Appellant had a duty to tell the police about Montrell, and that his failure to do so was evidence of his guilt. Appellant asserts that he suffered substantial prejudice when the prosecution was permitted to ask this series of questions that infringed upon his right to remain silent, and that a new trial is warranted.

The Commonwealth denies that the line of cross-examination, addressing Appellant's failure to come forth about the facts of the shooting prior to the day of trial, caused an improper reference to Appellant's constitutional right to remain silent. It is the position of the Commonwealth that the questions posed in this case were limited to Appellant's public, pre-arrest behavior and therefore, do not implicate the rule of *Turner*. The Commonwealth, relying on *Commonwealth v. Bolus*, 545 Pa. 103, 680 A.2d 839 (1996), asserts that the decision in *Turner* is limited to references to post-arrest silence, as distinguished from pre-arrest silence, and thus, Appellant's claim is without merit.

The series of questions to Appellant by the prosecutor motivating the present claim of error are as follows:

Q Okay.

So, sir, as I understand it, you are within feet of these two people, correct—or at least Derrick Washington, when he is shot and killed;  correct, sir?

A Correct.

Q Okay.

And as soon as you hear these shots you run.  Do you run to a pay phone to call 9–1–1?

A A pay phone?  I was running for my life.

Q Well, when you got to this house, wherever you got, sir, did you ever call the police or rescue?  Ever attempt to aid the people that were shot?

A The police was there, I believe.

Q Sir, did you ever call up and ask that fire rescue come and help the people that were shot?

A Wasn't no need for that because they was there.

Q Okay.

Sir, did you ever go to the police and tell them I saw Montrell Washington out there with a gun that night, and he was the one that was shooting.  Arrest that man for killing my niece or my cousins.  Did you ever do that, sir?

A No. Because they was looking for me for the killing.

Q Sir, you were out there.  You saw what happened, right? The only person out there was Montrell Washington with a gun, correct?  According to your testimony?

A That's right.

Q Okay.

You never called the police, never told the police what happened that night, did you sir?

A Why should I?

Q Why should you?

A Yeah.

Q That was your two cousins that were—

A The police—

Q Sir, let me finish my question. Let me finish my question.

Sir, you found out within hours that Jamika Wright, your cousin, who was blind, was shot dead. You found out that Derrick Washington was shot dead. Correct Sir?

A Correct.

Q And you saw the people who did this, correct?

A Correct.

Q You're telling these jurors who did it. Montrell, correct?

A Correct.

Q You didn't think it was important to call the police and tell them that you saw who killed your two cousins?

A Like I said, I was fearing for my life.

Q Sir, isn't it correct that this is the first time since November ninth of 1997 that you ever told anybody publicly who killed your two cousins?

Mr. LORUSSO [defense counsel]: Objection.[9]

THE COURT: Overruled.

Q Today's the first day; isn't that true?

A Excuse me?

Q Isn't that true, sir? Today is the first day you ever publicly said that Montrell Washington was the killer of your two cousins?

A This is the first time I had a chance to say it.

(T.T. 2/26/99, pp. 37–39).

■■ The accused in a criminal proceeding has a legitimate expectation that no penalty will attach to the lawful exercise of his constitutional right to remain silent. *Turner*, 454 A.2d at 540. Consequently, this court held in *Turner* that a defendant cannot be impeached by use of the inconsistency between his silence at the time of his arrest and his testimony at trial. *Id.*

---

**9.** Appellant also asserts that trial counsel was ineffective for failing to object earlier to this line of questioning. As stated previously, any claims raised in this appeal sounding in ineffectiveness are dismissed pursuant to *Grant*.

at 539. The defendant in *Turner* was convicted of voluntary manslaughter following a shooting in a bar. At trial, the defendant, for the first time, stated that the shooting had been in self-defense. During cross-examination, the prosecutor inquired as to why the defendant had never told the police that someone had been shooting at him on the night of the murder. *Id.* at 538. Defense counsel objected and moved for a mistrial. The mistrial was denied and a cautionary instruction given. On appeal this court reversed, holding that in cases in which the defendant offers his version of the events for the first time at trial, the prosecution is not permitted to impeach the defendant's testimony by reference to the defendant's previous silence. *Id.* at 540. Recognizing the strong disposition on the part of lay jurors to associate the exercise of the right to remain silent with an admission of guilt, and the substantial prejudice that would adhere to a defendant before the jury by exposure of his silence, this court found that, while some references to post-arrest silence may be harmless error, in this case it was not harmless. *Id.*

Following *Turner*, this court has been consistent in prohibiting the post-arrest silence of an accused to be used to his detriment. *See Commonwealth v. Costa*, 560 Pa. 95, 742 A.2d 1076 (1999) (direct question to the arresting officer as to whether the accused made any statement when arrested on child molestation charges was an impermissible reference to post-arrest silence); *Commonwealth v. DiPietro*, 538 Pa. 382, 648 A.2d 777 (1994) (even where the accused responds to some questions at the time of arrest, it is impermissible to reveal to the jury those questions to which the defendant chose to remain silent). *Commonwealth v. Clark*, 533 Pa. 579, 626 A.2d 154, 156 (1993) (the prosecutor's open-ended question to the defendant, "Did you *ever* think of telling the police what happened", could not reasonably be interpreted as limited to the defendant's actions pre-arrest, thus, it violated the rule of *Turner*). However, not all references to post-arrest silence were found to be detrimental to the accused so as to fall within the ambit of the rule of *Turner*. *See Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994) (reference to fact that accused

chose to remain silent at his extradition interview did not implicate the *Turner* prohibition on references to post-arrest silence); *Commonwealth v. Ragan,* 538 Pa. 2, 645 A.2d 811 (1994) (questions as to why it did not occur to the defendant that he should have revealed his alibi prior to trial were questions aimed at his cognitive functioning, not his silence); *Commonwealth v. Nolen,* 535 Pa. 77, 634 A.2d 192 (1993) (cross-examination designed to show that the defendant had the opportunity to hear all the witnesses testify at an earlier proceeding, and thus he could shape his current testimony accordingly, was not violative of *Turner*).

To run afoul of the rule in *Turner,* it must be clear that the testimonial reference is to post-arrest silence. This clarification of the *Turner* holding was underscored by the decision in *Bolus, supra.* In *Bolus,* the defendant was interviewed prior to his arrest and made several statements to law enforcement inconsistent with his trial testimony. In cross-examination, the prosecution impeached the defendant by inquiring why he had not offered the information revealed at trial to the police during their investigation. On appeal the defendant claimed this line of cross-examination violated the rule of *Turner.* This court rejected that argument, distinguishing *Turner* as only relevant to the defendant's post-arrest silence, and holding that when a defendant chooses to testify he waives his Fifth Amendment protection and is subject to impeachment through reference to pre-arrest silence. *Bolus,* 680 A.2d at 843–844 (*relying upon Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (the use of an accused's pre-arrest silence to impeach his credibility on cross-examination did not violate either the Fifth or Fourteenth Amendments)).

Appellant argues that the questioning in this case violated the rule of *Turner* as it implied that Appellant had exercised his right to remain silent, and because of the legitimate exercise of that right, his credibility was subject to impeachment. Appellant further argues that the distinction drawn in *Bolus* does not apply in this case, as the questioning encompassed the time frame from the day of the shooting until the day of trial. As the jury had already heard that Appellant

had been arrested ten days after the shooting, they could easily assume that the defendant had exercised his Fifth Amendment right to remain silent at the time of his arrest. Appellant asserts that the error in this case was not harmless.

In the Commonwealth's view, all the questions at issue focused on the public conduct of Appellant at the time of the shooting, and not his failure to tell police of his innocence at the time of his arrest. The Commonwealth asserts that none of the questions posed raised the specter of Appellant's silence while under interrogation for this crime; thus, this case is firmly controlled by *Bolus*, and there was no violation of the rule in *Turner*.

Not all testimonial exchanges can be easily divided into pre- or post-arrest scenarios that will be governed by application of either the holding of *Turner* or the decision in *Bolus*. In this case most of the questions clearly went to Appellant's pre-arrest actions at the time of the shooting or shortly thereafter. However, when the prosecutor asked the open-ended question, "Sir, isn't it correct that this is the first time since November ninth of 1997 that you ever told anybody publicly who killed your two cousins?" [10] the time frame was ambiguous. The ambiguity of the question is inherent in the absence of a clear time reference, thus, raising an inference that the question anticipated an answer that would embrace Appellant's actions from the moment of the shooting through the time of his arrest and up until the day of trial. This is exactly the type of question that this court condemned in *Clark*, 626 A.2d at 156.

Appellant is correct that a *Turner* violation occurred, as the last few questions posed in the series of questions set forth above do embrace more than the limited pre-arrest time frame as the Commonwealth asserts. Although we conclude that an improper reference to Appellant's silence was made, if we also conclude that it is clear that the error did not contribute to the

10. It was at this point in the cross-examination that trial counsel objected. The objection was overruled. (T.T. 2/26/99, p. 39).

verdict, the error may be deemed harmless. *Turner*, 454 A.2d at 540.

The standard for determining harmless error was firmly established in *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant. *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (1999). The burden of establishing that the error was harmless rests upon the Commonwealth. *Story*, 383 A.2d at 162 n. 11.[11]

The uncontradicted evidence in this case established that Appellant was at the scene at the time of the shooting. Appellant had gone to 321 Hall Place to meet with Montrell Washington after Appellant discovered Montrell had slapped Appellant's son earlier in the evening. Jamika Wright and Derrick Washington were shot at close range. The same gun that killed Jamika and Derrick fired the bullet that hit Montrell as he was running away from the scene. Appellant fled the scene of the shooting and evaded police for ten days, during which time he understood that the police were looking for him in connection with the shooting. *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902 (1991) (evidence of flight is admissible and relevant to establish an inference of guilt). Taking this evidence and comparing it in weight to the impact of the error caused when the prosecutor asked Appellant if the

---

11. Inexplicably, in this case the Commonwealth offers no alternative argument that the error was harmless, as it simply argues that no error occurred. We remind the Commonwealth that the burden of establishing harmless error rests squarely upon its shoulders. *Story*, 383 A.2d at 162 n. 11. Despite this lapse by the Commonwealth, we are not without advocacy on this issue as the question of harmless error was directly raised and addressed by Appellant. Jurisprudentially, we can affirm the action of the court below on other grounds. *Bearoff v. Bearoff*, 458 Pa. 494, 327 A.2d 72, 76 (1974).

day of trial was the first time since the shooting that he told anyone that Montrell was the shooter, this court concludes that the error created by this improper query was harmless.[12]

In the final claim of error, Appellant asserts that a new trial is warranted as the Commonwealth failed to provide the defense with exculpatory evidence as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[13] The exculpatory evidence Appellant points to is the criminal extract of Montrell Washington, the Commonwealth's primary witness. Montrell had been convicted of illegally carrying a firearm on a public street without a license in 1990 and in 1991. Appellant claims that this evidence was exculpatory as it would have bolstered Appellant's testimony that Montrell had a gun on the night of the shooting, and because the two convictions would have served to undermine Montrell's credibility.

*Brady* requires the Commonwealth to provide the accused with evidence in its possession that is favorable to the defense and material to guilt or punishment. *Id.* at 87, 83 S.Ct. 1194. A violation of *Brady* occurs when the Common-

12. The dissent contends that the evidence as recited above is not overwhelming when considered through application of the harmless error standard articulated in *Young.* Respectfully, *Young* is distinguishable. Unlike the defendant in *Young,* who not only denied any involvement in the murder, but also offered an alibi defense, Appellant concedes his presence at the scene, and his voluntary decision to place himself there in order to discuss the earlier "slapping" incident with Montrell. Additionally, in this case, there is evidence that the same gun fired all of the shots resulting in the two homicides and the aggravated assault. The dissent implies that by finding this evidence overwhelming we are making credibility assessments. Contrary to that belief, no assessment of credibility is required in viewing this uncontradicted evidence. Further, the dissent notes that the evidence we are relying upon is circumstantial and this court has not previously relied upon circumstantial evidence when evaluating under a harmless error configuration whether the evidence was overwhelming. In response, we note that this court has always relied upon circumstantial evidence when evaluating challenges to the sufficiency of the evidence and thus there is no impediment to considering the uncontradicted circumstantial evidence when conducting a harmless error analysis. *See, Commonwealth v. Dawson,* 464 Pa. 254, 346 A.2d 545 (1975).

13. Although this issue was not raised below we will review it under the doctrine of relaxed waiver, which applies to this case. *Freeman.*

wealth suppresses material evidence, favorable to the accused, and there is a reasonable probability if the evidence had been disclosed the outcome of the trial would have been different. *Commonwealth v. Paddy*, 569 Pa. 47, 800 A.2d 294 (2002).

Appellant does not allege, nor is there any evidence, that the Commonwealth suppressed the prior criminal record of Montrell Washington. Nor is it evident that the two prior convictions for carrying a firearm on a public street, occurring some six years before the incident at issue, would have been relevant to the events on the night of the shooting. Not only is there no evidence linking the prior convictions to the current charges, but further, firearms violations are not crimen falsi, thus, they would not have been admissible to impeach Montrell's credibility. *See Commonwealth v. Williams*, 524 Pa. 404, 573 A.2d 536 (1990). Without any showing that the Commonwealth intentionally suppressed the information regarding Montrell's prior convictions, or that the information was material to Appellant's defense, Appellant cannot establish that a *Brady* violation occurred, thus, on this record he is not entitled to relief.

Appellant's allegations of error relating to the penalty phase are all raised as allegations of ineffectiveness of trial counsel, and therefore are not reviewable at this juncture. *Grant.* However, as required by statute, we will review the sufficiency of the evidence presented as to the aggravating circumstances found by the jury. 42 Pa.C.S. § 9711(h)(3)(ii). The three aggravating factors found by the jury were 42 Pa.C.S. § 9711(d)(7), in the commission of the offense the defendant created a grave risk of death to another person; (d)(10), the defendant had been convicted of another crime punishable by death or life imprisonment, committed before or at the time of the current offense; and (d)(11), the defendant had been convicted of another murder, committed before or at the time of the current offense. The evidence supports a finding that Appellant committed two murders and an aggravated assault on the night in question. Jamika Wright and Derrick Washington were both killed by the infliction of a

gunshot wound to the chest at close range. Montrell Washington was struck in the left shoulder by a bullet while he was fleeing from the scene of the murders of Jamika Wright and Derrick Washington. Sufficient evidence was established to support the finding of all three aggravating circumstances as to both counts of murder in the first degree. Finally, our review of the record convinces us that the sentences of death were not the product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i).

Accordingly, we affirm the verdict and sentence of death and dismiss Appellant's claims of trial counsel ineffectiveness without prejudice to Appellant to raise those claims on collateral appeal.[14]

Justice NIGRO files a concurring opinion, joined by Justice NEWMAN, who also joins the majority opinion.

Justice SAYLOR files a dissenting opinion.

Justice NIGRO concurring.

I concur in the result reached by the majority. I write separately, however, to comment on what I see as the troubling fact that in sentencing Appellant, the jury found as aggravating circumstances both 42 Pa.C.S. § 9711(d)(10) and 42 Pa.C.S. § 9711(d)(11) for both of his first-degree murder convictions.

Section 9711(d)(10) of the death penalty statute provides for an aggravating circumstance where:

> the defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

---

**14.** The Prothonotary of this Court is hereby directed to transmit the complete record of this case to the Governor of Pennsylvania pursuant to 42 Pa.C.S. § 9711(i).

42 Pa.C.S. § 9711(d)(10). At the same time, Section 9711(d)(11) provides for an aggravating circumstance where:

the defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.

42 Pa.C.S. § 9711(d)(11).

Here, the jury found both Section 9711(d)(10) and Section 9711(d)(11) as aggravators for both of Appellant's first-degree murder convictions, meaning that each first-degree murder conviction formed the basis for a finding of the two substantially similar aggravators. In my view, such double-dipping is impermissible. *See Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1, 21 (1992) (although language in Section 9711(d)(10) and Section 9711(d)(11) is different, both aggravators encompass first-degree murder and therefore, the Commonwealth was allowed to present its evidence "under *either* aggravating factor") (emphasis added). However, whether the jury found three, as opposed to only two, aggravators in the instant case is of no moment, as they found no mitigating circumstances. *See* 42 Pa.C.S. § 9711(c)(1)(iv) ("the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance ..."). Given this fact, and the fact that Appellant has not challenged the jury's double-dipping here, I am able to join in the result reached by the majority.

Justice NEWMAN joins this concurring opinion, and also joins the majority opinion.

Justice SAYLOR dissenting.

The majority correctly frames the standard governing harmless error review as recently articulated in *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (1999) (on reargument): "[T]he properly admitted and uncontradicted evidence of guilt [must be] so overwhelming and the error ... so insignificant by comparison that the error could not have contributed to the verdict.' " *Id.* at 87, 748 A.2d at 194 (citation omitted). None the less, in its application the majori-

ty is apparently unable to characterize the uncontradicted evidence of Appellant's guilt in the present case as overwhelming. *See* Majority Opinion at 576 Pa. 280, 839 A.2d at 215 ("Taking [the uncontradicted] evidence and comparing it in weight to the impact of the error . . ., the court concludes that the error created by this improper query was harmless.").[1] This appears, at least to me, to be a dilution of the harmless error standard which the Court took pains to apply correctly in *Young.*

Here, as in *Young,* the defendant testified and, in doing so, contradicted material and substantial elements of the Commonwealth's case. Although I view the defense evidence as implausible, as several dissenting Justices also did in *Young,* the *Young* Court explained that courts are nevertheless obliged to faithfully implement the long standing, constitutionally based standard for harmless error, as follows:

> The dissenting opinion suggests that the evidence presented by Appellant was simply incredible, and thus should not be considered by this court to have in any fashion refuted the Commonwealth's case. Such credibility determinations, however, are for the factfinder to make, and are not within the province of an appellate court.

*Young,* 561 Pa. at 87 n. 16, 748 A.2d at 194 n. 16; *see also id.* at 86, 748 A.2d at 194 ("Where such factfinding functions are implicated, appellate courts are incompetent to choose which side's evidence is more persuasive."). Additionally, in its single-sentence comparative assessment concerning the impact of the prosecutor's reference to Appellant's silence, the majori-

---

1. Indeed, I am unaware of any previous decision in which this Court has described the quantum of circumstantial evidence identified by the majority as proof of Appellant's guilt (Appellant's having traveled to the crime scene—an outside location adjacent to a public street intersection—to meet one victim and his subsequent flight) as overwhelming. (While the majority also notes that the same gun fired the bullets that struck each victim, it does not explain, in terms of uncontradicted evidence, how this fact connects the gun to Appellant). Notably, in *Young,* involving a similar situation in which the defendant also evaded police and testified in contradiction to the Commonwealth's central proofs, *see Young,* 561 Pa. at 87, 748 A.2d at 194, the Court determined that the uncontradicted evidence of guilt was, in fact, not overwhelming.

ty fails to address this Court's past recognition of the substantial potential for prejudice associated with silence in the face of confrontation with alleged criminal conduct. *See, e.g., Commonwealth v. Turner,* 499 Pa. 579, 583, 454 A.2d 537, 539–40 (1982) ("We would be naïve if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." (quoting *Walker v. United States,* 404 F.2d 900, 903 (5th Cir.1968))); *see also Commonwealth v. Clark,* 533 Pa. 579, 587, 626 A.2d 154, 158 (1993) (characterizing references to an accused post-arrest silence as "innately prejudicial"). *See generally* Jeffrey O. Cooper, *Searching for Harmlessness: Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine,* 50 U. KAN. L.REV. 309, 340, 344 (2002) (discussing the rigorous analysis essential to harmless error review and questioning conclusory decision making that is "essentially opaque because it tends to [affirm on the basis of harmless error] in the most summary fashion, with little or no analysis"); Harry T. Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?,* 70 N.Y.U.L. REV. 1167 (1995) (discussing, at length, the difficulties facing appellate judges in adhering to an effect-on-the-verdict framework for harmless error review in cases in which the defendant's guilt seems well established, and the substantial consequences of failing to do so, particularly in terms of the erosion of constitutional rights).

Since I am unable to meaningfully distinguish *Young* in terms of harmless error review, or concur in the majority's weighing assessment, I am compelled to dissent.