J-S34041-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JEREMY S. HOSTETTER | |
| Appellant | No. 1844 MDA 2014 |

Appeal from the Judgment of Sentence entered October 2, 2014
In the Court of Common Pleas of Lancaster County
Criminal Division at No: CP-36-CR-0004778-2013

BEFORE:  BOWES, OTT, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:               **FILED SEPTEMBER 25, 2015**

Appellant Jeremy S. Hostetter appeals from the October 2, 2014 judgment of sentence entered in the Court of Common Pleas of Lancaster County ("trial court") following his jury conviction for attempted homicide, aggravated assault, and arson.[1]  Upon review, we affirm.

The facts and procedural history underlying this appeal are undisputed.[2]  On September 22, 2013, Appellant and his friend, Marlin J. Dyer, were involved in a physical altercation in the area of North Decatur Street and Wasp Street in Marietta, East Donegal Township, Lancaster County.  Appellant, who was carrying a container with ignitable fluid, then

_____

[1] 18 Pa.C.S. §§ 901 and 2501, 2702(a)(1), and 3301(a)(1)(i).

[2] Unless another source is cited, the facts are taken from the trial court's Pa.R.A.P. 1925(a) Opinion, 12/1/14, at 1-3.

intentionally doused Dyer's clothing and person with the accelerant and set Dyer on fire. As a result, Dyer suffered life-threatening injuries.

On September 23, 2013, Appellant was charged with attempted murder, aggravated assault, and arson. The case proceeded to a jury trial. On the third day of trial, Appellant sought to present the testimony of his mother, Robin Leed. At side bar, the following exchange between the parties occurred:

> [Defense counsel:] Your Honor, the defense would be offering as a witness Ms. Robin Leed, who is the mother of [Appellant]. Ms. Reed [sic] would be called solely to testify that when [Appellant] was a young boy, he had a serious physical issue which required surgery and which affected his life and his ability to run, participate in sports, or essentially those two things or anything else she might say about that. Those two matters, I believe, are relevant and probative to [Appellant's] ability to retreat with complete safety.
>
> [Trial court:] Be more specific about the physical issue you are referring to.
>
> [Defense counsel:] I'm trying to have her say where she's not going to get into the specifics, but I think she actually could—
>
> [Trial court:] I think she's going to have to, because I suspect the Commonwealth is going to want to –
>
> [Defense counsel:] That's fine.
>
> [Trial court:] What is it we're talking about?
>
> [Defense counsel:] He had two hip surgeries. He had surgery in one hip with a pin placed in the surgery and another hip with a pin placed in it. Then at least one pin broke, and then the other pin was removed. I think he actually still has the pin in him. And as a result of that, he has never been able to really run, engage in sports activity.
>
> [Trial court:] Your objection?
>
> [Commonwealth:] I've got a couple problems. One, based on what [defense counsel] said, these are childhood injuries. There's nothing current. Furthermore, a lot of this is medical testimony, which I would think would require a medical doctor. I

don't think the mom is competent to testify to these issues to a degree that would, I think, be reliable to a jury.

[The trial court:] [Defense counsel], I have a problem with it from the medical standpoint. I think if you're going to be arguing that he physically and medically cannot run, I think more than mom saying he had a childhood issue is appropriate.

[Defense counsel:] I would suggest to the [trial court] that the mother would be able to testify as to what she observed in him as a child.

[Trial court:] Well, what his condition was as a child is not relevant to what he is—how old is he now?

[Commonwealth:] He's 37.

[Trial court:] He's 37 years old.

[Defense counsel:] She would testify that as a child, she observed him going through these procedures. As a result of going through these procedures, he has not been able to do things that other people do.

[Trial court:] Is she going to testify about his ability to run when he was 36 years old?

[Defense counsel:] She'll testify that she's never seen him run after these operations.

[Commonwealth:] Your Honor, I'm not sure when a mother would see a 37-year-old man run. I think I have real concerns about this.

[Trial court:] Counsel, I'm not going to allow it. I think this requires medical testimony about his ability to run and the Commonwealth's ability to respond to it. A mother's testimony regarding a childhood injury which may or may not have resolved and his ability to run when he's 36 years old, I'm not going to permit it.

[Defense counsel:] For the record, I just want it to be clear that I believe it's probative for his ability to retreat with complete safety, and **the mother would testify that since this happened she has not been able to observe him do any of that from the time that he was 13 or whatever until he was 37**.

N.T. Trial, 7/28/14-7/30/14, at 431-34 (emphasis added). Appellant sought

to introduce Ms. Leed's testimony to establish he lacked the ability to retreat

and, therefore, acted in self-defense when he doused the victim with the accelerant and set the victim on fire. Ultimately, the jury found Appellant guilty of all charged offenses. On October 2, 2014, the trial court sentenced Appellant to 10 to 20 years' imprisonment for attempted homicide. The court also imposed a concurrent sentence of 4 to 8 years' imprisonment for arson. Appellant timely appealed to this Court.[3]

In his Pa.R.A.P. 1925(b) statement of errors complained of on appeal, Appellant asserted, *inter alia*, that the trial court abused its discretion in disallowing Ms. Leed "to testify that after having several hip surgeries as a child, [Appellant] was no longer able to run, and that this physical disability continued to the present day" because Ms. Leed was not a medical expert. Rule 1925(b) Statement, 11/24/14, at ¶ 2. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion, concluding that it did not err in disallowing Ms. Leed to testify about Appellant's ability to run following the surgeries. Specifically, the trial court concluded Ms. Leed was not competent to offer a medical opinion about Appellant's disability. Trial Court Opinion, 12/1/14, at 6-7.

---

[3] We note Appellant's pre-sentence investigation report is part of the original record. It should be noted that pursuant to Pa.R.Crim.P. 703 a pre-sentence investigation report is "confidential, and not of public record," which is available only to the authorities or the individuals listed therein. **See** Pa.R.Crim.P. 703. Accordingly, the Lancaster County Clerk of Courts should take all necessary steps to preserve the confidential nature of the pre-sentence investigation report by sealing it.

On appeal, Appellant challenges only the trial court's decision to disallow Ms. Leed's testimony.

Traditionally, in reviewing a trial court's decision regarding the admissibility of lay testimony, we determine whether the trial court has abused its discretion. *See Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa. Super. 2013), *appeal denied*, 80 A.3d 775 (Pa. 2013). Thus, a ruling disallowing evidence "'will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.'" *Id.* (citation omitted).

Although Appellant couches his argument under Pennsylvania Rule of Evidence 701, which governs opinion testimony by lay witnesses, we construe it to implicate Rule 602, which provides in part that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has *personal knowledge* of the matter." Pa.R.E. 602 (emphasis added). "Firsthand or personal knowledge is a universal requirement of the law of evidence." Pa.R.E. 602, Comment, citing *Johnson v. Peoples Cab Co.*, 126 A.2d 720, 721 (Pa. 1956).

Instantly, based on our review of the record, we conclude the trial court abused its discretion in disallowing Appellant's mother, Ms. Leed, to testify about Appellant's ability to run following childhood hip surgeries. As the transcript indicates, Ms. Leed was competent to testify that she had not seen Appellant run from the time Appellant was thirteen-years old to the present. This proposed testimony is fact-based, not opinion testimony under

Rule 701. Being Appellant's mother, Ms. Leed had first-hand knowledge about whether Appellant could run after the surgeries. Ms. Leed's proffered testimony also would have been relevant to establish an element of self-defense, *i.e.*, whether Appellant could retreat with complete safety. **See** 18 Pa.C.S.A. 505(b)(2)(ii).

To the extent the Commonwealth argues that Ms. Leed's testimony would have amounted to an impermissible expert opinion, we disagree. Here, Ms. Leed's testimony was not proffered to establish that Appellant's inability to run was caused by the hip surgeries. Rather, the testimony was proffered only to establish that Ms. Leed had not seen her son, Appellant, be able to run since he had the surgeries. Based on the foregoing, the trial court abused its discretion in excluding Ms. Leed's testimony.

Our inquiry, however, does not terminate here. In determining whether the trial court's error requires the grant of a new trial, we must consider whether the error was harmless.[4]

In **Commonwealth v. Cooley**, __ A.3d __, 2015 WL 4068720 (Pa. 2015), our Supreme Court explained that "[a]n error is harmless if it could not have contributed to the verdict. In other words, an error cannot be harmless if there is a reasonable possibility the error might have contributed

---

[4] "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." **Commonwealth v. Reese**, 31 A.3d 708, 719 (Pa. Super. 2011) (*en banc*) (citation omitted).

to the conviction." ***Cooley***, 2015 WL 4068720, at \*8 (citation omitted); ***see also Commonwealth v. Mitchell***, 839 A.2d 202, 214-15 (Pa. 2003) ("An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict.").

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Hutchinson***, 811 A.2d 556, 561 (Pa. 2002) (citation omitted).

As noted above, Appellant here sought to introduce his mother's (Ms. Leed) testimony to establish that he set the victim ablaze in self-defense because he could not retreat with complete safety given his inability to run.

It is settled that to invoke a claim of self-defense, the following three conditions, as provided by statute and as interpreted by our case law, must be satisfied:

> a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself therefrom; and c) the slayer did not violate any duty to retreat or to avoid the danger.

***Commonwealth v. Hansley***, 24 A.3d 410, 421 (Pa. Super. 2011) (citing ***Commonwealth v. Mayfield***, 585 A.2d 1069, 1070-71 (Pa. Super. 1991) (*en banc*)); 18 Pa.C.S.A. § 505.

Here, Appellant's claim that he could not retreat with complete safety is belied by the record. The victim, Marlin J. Dyer, testified that he had been friends with Appellant for "seven to ten years" and that Appellant worked for the victim's son's automotive business. N.T. Trial, 7/28/14, at 82. The victim testified that, on September 22, 2013, he treated Appellant to breakfast because Appellant had put a windshield wiper motor in the victim's car the day before. *Id.* at 83. The victim testified that after breakfast, Appellant stopped by the victim's house between noon and 1 p.m., because the victim had invited Appellant for a cookout. *Id.* at 85. When Appellant arrived, the victim, Debra, Kelly, and Jay were at the residence. *Id.* The victim identified Jay as his best friend and Kelly as his roommate with whom he had been involved romantically. *Id.* at 82. The victim identified Debra as his friend whom he had been seeing for seven years and with whom he was romantically involved at the time. *Id.* at 86-87. The victim testified that while everyone was watching TV, Kelly complained that "her back was killing her." *Id.* at 87. In response, Appellant "put his hand down her blouse and was rubbing her back. And then he put her blouse up around her shoulders and opened her bra and was massaging her back. And she was sitting there half naked." *Id.* at 87-88. The victim testified that Kelly did not have a problem with Appellant's actions, because she "did not say anything." *Id.* at 88.

Problems, however, ensued. The victim testified:

And then [Appellant] got up and walked over to Debbie for some reason and staggered over to her and put his hand down her

- 8 -

back and started rubbing her back and tried to put his hands down her front. She says knock it off, Jeremy. She says, Marlin, she says, get him off of me.

. . . .

And I didn't even get out of my chair. Alls I said was, Jeremy, look, get your hands off my girlfriend. And then [Appellant] was upset and, yes, sir. And you know, more or less, you know, got out, left. He was all pissed off because I wouldn't let him manhandle her. It didn't make any sense to me.

*Id.* at 88. The victim testified that several hours later, between 6:30 p.m. and 7 p.m., Appellant returned to his house. *Id.* at 89. The victim testified that Kelly told him Appellant was on the porch with two gas cans, threating to burn down the house. *Id.* at 90-91. The victim testified that when he found out about Appellant's threat, he was in a pair of silk shorts performing work in his bathroom. *Id.* at 92. He changed into jeans and put on a T-shirt and went out to the porch to confront Appellant. *Id.* Appellant, however, was no longer there. *Id.*

Fearing Appellant would return to torch his house, the victim asked Kelly to give him a ride to Appellant's house. *Id.* at 96. The victim testified that, on the way to Appellant's house, they spotted Appellant "in the distance walking with two cans of gas in each hand." *Id.* The victim testified that he told Kelly to pull over. *Id.* at 98. "I jumped out and started like kind of jogging a little bit towards [Appellant] yelling, Jeremy, Jeremy[,]" the victim testified. *Id.* Describing Appellant's reaction, the victim testified:

[Appellant] just kept walking. He looked back at me and kept walking. So I walked up. I said, we got to talk. I says, we got to talk. I says, what's wrong, what's going through your head?

- 9 -

And [Appellant] just said, stay back, just get away. Get away, get away.

*Id.* at 98. The victim testified that "when I finally got up to [Appellant], he still wouldn't talk to me or nothing. He just kept, you know, walking. Then [Appellant] spun around at one point, and I guess I tapped him in his—hit him in his forehead, I guess, one time." *Id.* at 99. The victim then clarified that he had "punched [Appellant] in the forehead, but [he] didn't knock [Appellant] down or nothing." *Id.* at 100. The victim explained that he was friends with Appellant and that, by punching the Appellant, he had attempted to get Appellant's attention to inquire about what was happening. *Id.*

Describing what occurred following the punch, the victim testified:

[Appellant] spun around. He dropped the one can and spun around, turned his back. I see [Appellant] going like this. And I didn't know what he was going to do. I had no idea. So he threw the cap down and went like this, like he was going to squeeze it on me. So I ran as fast as I could, which ain't real fast. [Appellant] caught up with me. I was up to the edge of the road. And he squeezed it all over me and said, there, you sick fuck, and took a pack of matches and lit the whole pack up. Alls I was thinking, when I get in my vehicle, it's going to smell like gas the rest of its life. I'm going to have to get rid of it. That's all I thought it was, you know. I'm already doused with gas. When I see that pack of matches got—him whip a couple out of the pack and strike it, throw it on my chest, I went up in 14-foot flames.

*Id.* at 100-01. The victim emphasized that after Appellant had doused him, he "was trying to get away from [Appellant]," running towards his truck. *Id.* at 102-03. Appellant, however, chased him and lit him on fire. *Id.* at 104-05.

Peter Elser, a young landscaper who was acquainted with Appellant, testified that on the evening of the incident, he encountered Appellant at the corner of Wasp Street and Decatur Street. *Id.* at 158. Appellant was walking while holding a black, quart-size bottle. *Id.* at 158-59. Elser testified that as he was walking with Appellant, "a truck pulled up and somebody got out of the truck." *Id.* at 161. "[W]hoever was in the truck was yelling something out of the truck. And when it stopped, a large white male got out and approached us." *Id.* at 163. Elser testified that the male yelled something about "you're going to burn down my trailer or something like that." *Id.* at 163-64. Elser testified that the large while male, later identified as the victim, walked briskly towards Elser and Appellant, who were stopped. *Id.* at 165-66. According to Elser's testimony, Appellant rejected the victim's accusation that Appellant was going to burn down the trailer. *Id.* at 167. Following the verbal exchange, Elser testified that the victim pushed Appellant in the head from a distance of two to three feet. *Id.* at 168-69. The push caused Appellant "to [move to] the side a little bit, there wasn't enough force to knock him down." *Id.* at 169-70. Appellant retaliated. *Id.* at 169. Elser testified that the victim and Appellant "had a brief scuffle," but no "punches" were thrown. *Id.* "They were just like pushing each other. And there might have been a few—like they threw their arms, but no punches." *Id.* at 170. Elser testified that during the scuffle, Appellant held the bottle in his hand. *Id.* at 171. The scuffle lasted fifteen to twenty seconds. *Id.* After the scuffle ended, Appellant and the victim

stood further apart—three to four feet. *Id.* at 173. Elser testified that, at this point, he observed Appellant make "an underhanded throwing type of motion." *Id.* at 172-73. Upon observing the motion, Elser testified that "liquid went on [the victim's] chest and face[.]" *Id.* at 174. "[The victim] kind of looked like he had something in his eyes and he stepped back like this and kind of went like this." *Id.* Specifically, Elser testified that the victim "took several steps backwards." *Id.* When the victim was hit with the liquid, he was approximately six feet away from Appellant. *Id.* at 175. Appellant then went "up to [the victim.]" *Id.* Elser testified that he observed Appellant make a motion with his hand and "saw [the victim] go up in flames instantly." *Id.* at 176.

On cross-examination, Elser acknowledged that barely three to four seconds lapsed between the time the victim was doused and set ablaze. *Id.* at 193. Elser also acknowledged that he did not know whether Appellant or the victim backed up following the scuffle, prior to the dousing. *Id.* at 201.

Audrey Flanagan, an eyewitness to the incident in question, testified that she was a passenger in a car, heading back to her parents' house. *Id.* at 222-23. As she saw two young men walking on the shoulder of the road, she observed something unusual. *Id.* at 223. Flanagan testified that she observed "a black pickup truck that was coming toward us . . . . [a]nd the door, passenger door, of said black truck flew open before the truck had time to park or stop." *Id.* Flanagan testified that she saw "an older gentleman," later identified as the victim, exit the truck, hurriedly going in

- 12 -

the direction of the young men, one of whom was identified as Appellant.[5] *Id.* at 225-26. Flanagan testified that when the truck stopped, the pedestrians kept on walking. *Id.* at 228. She testified that the victim caught up to the pedestrians. *Id.* at 229. The victim took [Appellant's] head and shoved it." *Id.* at 230. Flanagan testified that she observed Appellant "shove[] the [the victim] back." *Id.* at 231. The victim then "tried to go back across toward the truck again, and [Appellant] followed him. There was some shoving going on there, as well[,]" Flanagan testified. According to her testimony, the next thing she observed was a sudden "explosion of flame." *Id.* at 233. Flanagan testified that "I had hoped at first that it was the truck, but when I saw the ball of fire come back across the road, then I knew it was a person." *Id.*

Based on the evidence, we conclude that Appellant could not have established self-defense. Specifically, Appellant fails to establish that he reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use such force to save himself therefrom. *See Hansley*, *supra*. Similarly, Appellant fails to establish that he did not violate any duty to retreat or to avoid the danger. *Id.*

_____

[5] The transcript indicates that Flanagan observed much of the incident from the "rearview window" of the moving car in which she was a passenger. N.T. Trial, 7/28/14, at 225-33.

The undisputed facts here do not reveal that Appellant was in imminent danger of death or great bodily injury. Rather, the facts indicate only that Appellant and the victim engaged in a brief scuffle, following which Appellant doused the victim with ignitable fluid. Moreover, the undisputed facts indicate that after Appellant doused the victim with the fluid, the victim moved away from Appellant toward his truck. At this point, it was Appellant who followed the victim to set the victim on fire. Based on these facts, it is of no moment whether Appellant had the ability to run for purposes of retreating when it was Appellant who pursued the victim after the victim moved away from Appellant. Thus, the uncontradicted evidence against Appellant's claim of self-defense mitigates against any prejudicial effect of the trial court's error, *i.e.*, the disallowance Ms. Leed's testimony, so that the error beyond a reasonable doubt could not have contributed to the verdict. **See Hutchinson**, **supra**. Accordingly, we consider the trial court's error in excluding Ms. Leed's testimony to be harmless. **See Commonwealth v. Allshouse**, 36 A.3d 163, 182 (Pa. 2012) (Appellate courts may affirm a judgment based on harmless error even if such an argument is not raised by the parties); **see also Commonwealth v. Johnson**, 941 A.2d 1286, 1290 n.2 (Pa. Super. 2008) (reiterating appellate court can uphold trial court's decision if there is any proper basis for result reached; appellate court is not constrained to affirm on grounds relied upon by trial court) (citation omitted).

Judgment of sentence affirmed.

Judge Ott joins the memorandum.

Judge Bowes concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/25/2015