**[J-78-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 22 MAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered May 24, |
| | : | 2021 at No. 1788 MDA 2019 |
| v. | : | Affirming in Part and Vacating the |
| | : | Judgment of Sentence of the |
| | : | Bradford County Court of Common |
| JONATHAN RIVERA, | : | Pleas, Criminal Division, dated |
| | : | September 26, 2019, at No. CP-08- |
| Appellant | : | CR-0000606-2018 and Remanding |
| | : | for Resentencing. |
| | : | |
| | : | ARGUED:  November 29, 2022 |

<u>**OPINION**</u>

**JUSTICE BROBSON**                                        **DECIDED:  June 21, 2023**

This discretionary appeal allows us to consider harmless error in the context of post-arrest silence.  At trial, the prosecutor in this case asked the arresting officer a series of questions about the defendant's post-arrest behavior, particularly whether the defendant denied the charges against him.  Over a defense objection, the officer told the jury, four separate times, that the defendant, upon his arrest, stood mute and denied none of the charges.  The Superior Court ruled that this testimony was admitted in error but, relying on authorities discussing pre-arrest silence, found it harmless.  We accepted review to reiterate that different harmless error standards apply when evaluating testimonial references to a defendant's post-arrest versus pre-arrest silence.  Oriented correctly, we conclude that the testimony in this case was not harmless beyond a reasonable doubt.  Therefore, we must award the defendant a new trial.

## I.

In April 2018, Florencia Mainetto (Florencia) recorded cellphone videos of her daughter (G.R.) and her niece (C.P.), both minors at the time, accusing Appellant Jonathan Rivera (Rivera) of sexual abuse. After sharing these videos with Trooper Higdon of the Pennsylvania State Police, Florencia and her sister, Katherin Mainetto (Katherin), who is C.P.'s mother, brought G.R. and C.P. to the Children's Advocacy Center of Towanda (Advocacy Center) for formal forensic interviews. Trooper Higdon observed these interviews through a window. A nurse at the Advocacy Center then examined G.R. and C.P. but did not find any physical evidence of abuse. Later, two more minors, S.C. and S.M., made similar allegations against Rivera. Combined, the victims alleged that Rivera abused them between the years of 2009 and 2018.

On June 26, 2018, Trooper Higdon filed a criminal complaint and affidavit of probable cause against Rivera, alleging, *inter alia*, rape of a child. That day, with an arrest warrant in hand and other officers in tow, Trooper Higdon went to Rivera's house, apprised him of the charges against him, read the *Miranda*[1] warnings, and placed him under arrest. Upon his arrest, Rivera did not deny the charges; rather, he remained silent—as was his right under the state and national constitutions. *See* Pa. Const. art. 1, § 9 ("In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself[.]"); U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). *See generally Watts v. Indiana*, 338 U.S. 49, 54 (1949) ("Under our system society carries the burden of proving its charge against the accused not out of his own mouth[.]").

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

After the Commonwealth filed a 26-count information against Rivera,[2] the matter proceeded to a jury trial. The Commonwealth's case-in-chief, as the transcripts reflect, was testimony-heavy. The Commonwealth called 11 witnesses over two days, starting with the employee at the Advocacy Center who conducted the forensic interviews. She explained the general method of such interviews but expressed no opinion about the veracity of the allegations. (*See* Notes of Testimony (N.T.), 8/6/2019, at 28-43.) G.R. testified next. She recounted several instances of abuse, including times where Rivera would play "truth-or-dare" with her and C.P., which, she stated, often ended with him "put[ting] his private in our butt;" an instance of abuse in a vehicle; a time where Rivera showed her and C.P. pornographic videos in a barn; and a situation when she had to be medevacked to a hospital because, she said, Rivera choked her with a lollipop (the lollipop incident). (*Id.* at 60, 61, 65-66, 67, 70.) The paramedic who responded to the lollipop incident then briefly testified to the incident from his perspective.

Florencia testified next. She said she originally chalked up the lollipop incident to "a kid's mistake" but became suspicious after G.R. told her she had a dream of Rivera "playing with [her and C.P.] with [a] lollipop." (*Id.* at 130.) Florencia admitted she had an affair with Rivera (who was in a relationship with Katherin at the time) and conceded that she was formerly an undocumented immigrant and did not become a permanent resident

---

[2] As they appear in the original information, the charges, in order, were: one count of aggravated assault, 18 Pa. C.S. § 2702(a)(1) (felony 1); four counts of rape of a child, 18 Pa. C.S. § 3121(c) (felony 1); four counts of involuntary deviant sexual intercourse with a child, 18 Pa. C.S. § 3123(b) (felony 1); five counts of attempted aggravated indecent assault, 18 Pa. C.S. § 901(a) (felony 2); one count of endangering welfare of children, 18 Pa. C.S. § 4304(a)(1) (felony 3); four counts of corruption of minors; 18 Pa. C.S. § 6301(a)(1)(ii) (felony 3); one count of simple assault, 18 Pa. C.S. § 2701(a)(1) (misdemeanor 1); four counts of indecent assault, 18 Pa. C.S. § 3126(a)(7) (misdemeanor 1); and one count of indecent exposure, 18 Pa. C.S. § 3127(a) (misdemeanor 1). Prior to trial, the trial court dismissed one count of indecent exposure as duplicative.

until late 2017. Florencia then noted that, after Rivera told her that C.P. and G.R. saw "him naked or whatever" several times, she decided to record the cellphone videos of G.R. and C.P. because she thought "it will help with . . . if I, you know[,] to have evidence." (*Id.* at 139, 143.) Florencia denied having "coach[ed]" G.R. or C.P. and denied having told either of them "what to say." (*Id.* at 145, 147.)

Part of defense counsel's strategy on cross-examination involved trying to undermine Florencia's credibility. (*See id.* at 151 ("[Y]ou were worried that if an affair came out your husband would leave you, or [he] wouldn't sign [the] papers to allow you to be a legal resident of the United States[?]"); *id.* at 159-60 ("[Y]ou knew that if you accused somebody of . . . some sexual offense you would be permitted to remain in the United States. Correct?").) Florencia also conceded that she "falsely" told Katherin she did not have the video of C.P. because Trooper Higdon told her to delete it. (*Id.* at 168.) C.P. testified to close out the first day of trial; her testimony more or less tracked G.R.'s.

The second day of trial kicked off with testimony from C.P.'s father. He said he noticed C.P. began "acting weird" around the time she was living with Rivera and Katherin but otherwise testified in generalities. (N.T., 8/7/2019, at 6.) After S.C. and S.M. briefly recounted incidents of abuse, S.M.'s mother (Rivera's ex-wife) testified. She discussed the first time S.M. told her Rivera touched her inappropriately and explained how she became involved in the case. Trooper Higdon testified next, and it was during his testimony that the exchange precipitating this appeal occurred.

To provide context for the exchange at issue, during cross-examination of Trooper Higdon, defense counsel focused on the absence of physical evidence indicated by the findings in the reports:

**Q.** But anyway, [the physical examination reports] end up in your file?
**A.** Correct.
. . . .

**Q.** And you reviewed the file, didn't you?

**A.** Yes.

**Q.** And there [were] negative findings on both [G.R.] and [C.P.], am I correct?

**A.** Can you explain what you mean by negative findings[?]

**Q.** There [were] no tears, am I correct?

**A.** Correct.

. . . .

**Q.** There was no, . . . their hymens were still intact, correct?

**A.** Correct.

. . . .

**Q.** There was nothing found . . . by the physician or by the nurse of the anus, am I correct?

**A.** Correct.

**Q.** There [were] smooth edges [that] were indeterminate for sexual abuse?

**A.** Correct.

**Q.** And you still arrested my client[?]

**A.** Correct.

**Q.** So[,] therefore[,] you arrested my client based upon the forensic interview[s]?

**A.** Well not solely, but correct.

**Q.** Well you never talked to my client, did you?

**A.** No, I attempted to.

**Q.** So we have a lying Florencia, who lied to Katherin . . . that you told her to destroy [the cellphone recordings of C.P.]  But most of your information you received [from] Florencia, am I correct?

**A.** Most of my information I received from the victims.

**A.** From Florencia telling you who the victims were, am I correct?

**Q.** Florencia told me of two of the victims, her daughter and her niece.

(*Id.* at 99-100.)  The following exchange, which gives rise to the issue now before this

Court, occurred immediately on re-direct:

**Q.** [Commonwealth Attorney]: I'd like to direct your attention to June 26, 2018, at about 1400 hours, did you . . . go to the home of [Rivera]?

**A.** [Trooper Higdon]: Yes.

**Q.** And was he arrested based on the arrest warrant?

**A.** I had an arrest warrant in hand, correct.

**Q.** At approximately 1430 hours, did you read [Rivera] his Miranda [w]arnings?

**A.** Yes.

**Q.** So what, what are the Miranda [w]arnings?

**A.** Miranda [w]arnings are, I'll say in easy terms of their right to remain silent.

**Q.** *Okay. After you read him his Miranda warnings, he never told you that he didn't do anything to any of these kids?*

**A.** No.

**Q.** *He never denied doing anything to –*

> **Defense Counsel**: Objection to that. A person doesn't have to deny.

> **The Court**: You're correct, I think he's just asking if he did. You may answer.

**A.** He did not deny.

**Q.** *He never said[,] I didn't do this?*

**A.** No.

**Q.** *What did he say?*

**A.** Nothing, he said he wished not to talk.

**Q.** No more questions.

(*Id.* at 101-02 (emphasis added).) The trial court then addressed the jury: "Okay[,] and just to [defense counsel's] point, that is his right as a defendant, okay, [c]onstitutional [r]ight." (*Id.* at 102.) Notably, after the prosecutor asked these four questions about Rivera's post-arrest, post-*Miranda* silence, defense counsel did not request a sidebar, ask for a curative instruction, or move for a mistrial. The trial pressed on with the Commonwealth's final witness, the nurse who physically examined the victims. She

noted that she did not "see any physical injuries" on any of the victims but stressed that this does not necessarily rule out abuse. (*Id.* at 114.) The Commonwealth rested.

To begin his case-in-chief, Rivera called Florencia's husband and his own mother; both testified briefly and generally. (*See id.* at 124-35.) The next day, before hearing any more testimony, the trial court dismissed three counts for insufficient evidence, downgraded one count, and allowed the Commonwealth to amend the information and upgrade two counts from the misdemeanor to the felony level.

When the jury returned, Rivera called two more witnesses: First, his sister, who said she never observed any concerning behavior (*see* N.T., 8/8/2019, at 13-19), and, second, Katherin. Katherin explained why she chose to be a defense witness, noting she first became suspicious about the allegations after the forensic interviews because Florencia "kept saying . . . I'm going to sue [Rivera] for everything" and "kept constantly talking about money." (*Id.* at 46-47.) On one occasion, Katherin said Florencia told her "I'll be able to get my citizenship quicker" if Rivera was convicted of a crime. (*Id.* at 48.) She also noted that she regularly bathed both C.P. and G.R. and never saw signs of abuse and said neither C.P. nor G.R. complained to her about being abused. During cross-examination, Katherin admitted she was pregnant with Rivera's son at the time of the lollipop incident and reiterated that her doubts about the allegations really solidified after she learned of Florencia's affair with Rivera.

Lastly, Rivera took the stand. Among other things, he denied abusing the victims, offered a partial alibi defense for some of the accusations, and explained why he believed that the mothers of G.R. and S.M. were not credible witnesses. For example, he speculated that Florencia was upset that he ended the affair with her and noted that he had a divorce action pending with S.M.'s mother with "a lot of money" at stake. (*Id.* at 72.) After the Commonwealth called a rebuttal witness who briefly recounted one incident

of abuse, the parties made their respective closing arguments. The prosecutor, notably, did not bring up Rivera's post-arrest, post-*Miranda* silence in his summation. Ultimately, the jury returned a split verdict—it acquitted on the most serious charges, *i.e.,* Count 1 (related to the lollipop incident) and Counts 2-9 (including rape of a child) and found Rivera guilty of all the remaining 11 counts.

On appeal, and relevant here, Rivera argued that the trial court erred by permitting the testimony regarding his post-arrest silence. Stressing the lack of physical evidence and the absence of a promptly filed report, moreover, he characterized the case as having turned on credibility, particularly his own. The disputed testimony, he claimed, irreparably undermined his credibility in the eyes of the jury before his case-in-chief even began. Pointing also to the split verdict and the fact that, in his view, the trial court's brief comment to the jury at the conclusion of the prosecutor's re-direct could not be classified as a curative instruction, Rivera asserted that the allowance of the disputed testimony was not harmless. As such, he argued he was entitled to a new trial.

The trial court rejected this argument. "It was not unfairly prejudicial to [Rivera]," the trial court first noted, "for the Commonwealth to simply point out, in telling the narrative of the investigation and arrest, that [Rivera] exercised his constitutional right to remain silent," as "[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." (Trial Ct. Op. at 6 (quoting *Commonwealth v. Whitney*, 708 A.2d 471, 478 (Pa. 1998), and *Commonwealth v. DiNicola*, 866 A.2d 329, 337-38 (Pa. 2005) ("[T]he mere revelation of silence does not establish innate prejudice.")).) In addition, the trial court noted that it informed the jury about Rivera's "right to remain silent, and the rule of law establishing that said silence cannot be held against him nor used to infer he is guilty" during both "preliminary and concluding instructions." (*Id.*) Besides, the trial court stated,

"[i]n the end, [Rivera] took the stand anyway, telling the jury his side of the story." (*Id*.) Therefore, "even if the brief inquiry into [Rivera's] post-*Miranda* silence was potentially problematic, the [trial court's] immediate curative instruction, the relevant preliminary and concluding instructions, [Rivera's] own testimony, and the failure of the prosecuting attorney to ever again mention [his] post-*Miranda* silence" rendered, in the trial court's view, any potential error related to the disputed testimony harmless. (*Id*.)

After granting Rivera's motion for reconsideration and withdrawing its prior panel decision, a three-judge panel of the Superior Court then affirmed in part, reversed in part, and remanded for resentencing.[3] *See Commonwealth v. Rivera*, 255 A.3d 497 (Pa. Super. 2021). As to the testimony issue, the Superior Court first rejected the Commonwealth's argument that the prosecutor's questions were a "fair response" to defense counsel's questions. *Id.* at 505. Prior to the disputed testimony, the Superior Court noted, defense counsel had briefly inquired into Rivera's *pre-arrest* silence. Questions about pre-arrest silence, the Superior Court reasoned, do not open the door to questions about post-arrest silence, because they do not create a "factual inconsistency with regard to whether [Rivera] denied the allegations against him '*at the time of [his] arrest*,'" which is required for the fair response doctrine to apply. *Id.* at 506 (emphasis in original) (quoting *Commonwealth v. Turner*, 454 A.2d 537, 539-40 (Pa. 1982)). Thus, the Superior Court ruled that the disputed testimony was admitted in error.

---

[3] As noted, the trial court permitted the Commonwealth on the last day of trial to amend the information and upgrade two counts from the misdemeanor to the felony level. The jury found Rivera guilty of both counts. Relying on *Commonwealth v. Sinclair*, 897 A.2d 1218 (Pa. Super. 2006), the Superior Court vacated these convictions and remanded for resentencing given that the absence of these charges upset Rivera's overall sentence. The Commonwealth does not presently challenge this aspect of the holding.

Nevertheless, the Superior Court found that "the trial court's error was harmless because the prejudice to Rivera, if any, was de minimis," citing the three-prong test for harmlessness:

> [H]armless error exists [if] . . . (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* at 506-07 (quoting *Commonwealth v. Hairston*, 84 A.3d 657, 671-72 (Pa. 2014) (quoting *Commonwealth v. Hawkins*, 701 A.2d 492, 507 (Pa. 1997), *cert. denied*, 523 U.S. 1083 (1998))), *cert. denied*, 574 U.S. 863 (2014).

Despite having dispatched the fair response argument by distinguishing pre- and post-arrest silence, the Superior Court then cited a batch of pre-arrest silence authorities in its harmless error analysis. Chiefly, it relied on *Commonwealth v. Adams*, 104 A.3d 511 (Pa. 2014) (plurality), which, it surmised, "found harmless error where the prosecutor elicited testimony that referenced the defendant's post-arrest silence because the reference was 'contextual and brief and did not highlight [d]efendant's silence as evidence of guilt'" but only "recount[ed] the sequence of the [Commonwealth's] investigation." *Rivera*, 255 A.3d at 507 (quoting *Adams*, 104 A.3d at 518). The court then referenced *DiNicola* and *Whitney* without discussion. In a parenthetical, it summarized *DiNicola* as reflecting a scenario "where defense counsel first created [an] inference that [the] Commonwealth's investigative efforts were minimal" and then an officer, in a brief and "circumspect" fashion, testified that the defendant "declined [a] police interview." *Id.* (quoting *DiNicola*, 886 A.2d at 337). Additionally, the court quoted *Whitney* for the same sentence the trial court did—"[e]ven an explicit reference to silence is not reversible error

where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt." *Id.* (quoting *Whitney*, 708 A.2d at 478).

Applying these cases, the Superior Court opined that, "in recounting the sequence of the Commonwealth's investigation into Rivera's case, Trooper Higdon's reference to [his] post-arrest silence—that [he] failed to deny the allegations against him and wished not to talk after receiving his *Miranda* warnings—resulted in de minimis, if any, prejudice." *Id.* at 507 (internal quotation marks omitted). Like in *Adams*, the Superior Court concluded in this case that the reference to Rivera's silence was "contextual and brief" and simply "rebutted the inference that police officers had failed to interview Rivera *at all* as a part of their investigation into his case, rather than highlight[ing his] silence at the time of his arrest as evidence of his guilt." *Id.* (emphasis in original) (internal citation omitted). Further, the Superior Court stressed that "the Commonwealth did not mention Rivera's post-*Miranda* silence again or reference it during closing argument." *Id.* Thus, as "the trial court's error in admitting Trooper Higdon's brief and contextual testimonial reference to Rivera's post-*Miranda* silence—where such reference was not relied upon as substantive evidence of Rivera's guilt—did not deprive Rivera . . . of a fair trial," the Superior Court concluded that the error was harmless and declined to award a new trial. *Id.* at 508.

This Court accepted review to consider the following issue:

Whether prejudice is presumed from the improper use at trial of post-arrest, post-*Miranda* silence, requiring the Commonwealth to show beyond a reasonable doubt that the error did not affect the verdict—or whether, as the Superior Court held, the standard that governs the use of pre-arrest silence, from which prejudice is not presumed, also governs constitutional harmless error from the improper use of post-arrest, post-*Miranda* silence?

*Commonwealth v. Rivera*, 273 A.3d 510 (2022) (per curiam).

Readying for a harmless error review, Rivera opens his brief by summarizing the trial. "As the parties' opening statements reflect," he contends, "it was a credibility contest

from the start" given that "[n]o prompt complaint had addressed any of the accusations" and "no physical evidence corroborated any of them."  (Appellant's Br. at 7-8.)  The jury weighed five defense witnesses against, he suggests, "a prosecution narrative built on statements by the young complainants and some of their mothers," whose credibility he "vigorously" challenged during cross-examination.  (*Id.* at 8.)  His own testimony, he argues, was the "centerpiece of the defense," insofar as he denied, for the first time, the allegations, offered a partial alibi defense, and "developed the mothers' motives to lie." (*Id.* at 10-11.)  But the unconstitutional testimony, he avers, fatally undermined his credibility before his case-in-chief began.  (*Id.* at 11.)

Turning to the heart of the argument, Rivera asserts that the Superior Court's primary error in this case was that court's reliance on pre-arrest silence cases.  Keeping pre-arrest silence authorities distinct from post-arrest silence authorities is essential, he claims, for as this case illustrates different harmless error standards pertain for each. Reading our cases, he suggests that, in pre-arrest cases, prejudice is not innate, and a defendant must show that prejudice has been created as a result of the admission of pre-arrest silence.  This is in contrast, he asserts, to post-arrest cases, where prejudice is innate, and the prosecution must prove beyond a reasonable doubt that prejudice was cured.  (*See id.* at 21-22.)  Oriented properly as a post-arrest case, he claims it becomes "impossible" here "to say beyond a reasonable doubt that the error did not affect the [jury's] deliberations."  (*Id.* at 24.)

"[M]ost laymen," Rivera observes, "view an assertion of the Fifth Amendment privilege as a badge of guilt."  (*Id.* at 26 (quoting *Commonwealth v. Haideman*, 296 A.2d 765, 767 (Pa. 1972)).)  For this and other reasons, he maintains that "an unbroken line of state and federal precedent" protects post-arrest silence and that the "Pennsylvania Constitution provides greater protection tha[n] the [United States] Constitution," as our

constitution protects post-arrest silence regardless of when *Miranda* warnings are read. (*Id.* at 26 & n.14.)  As this Court has "time and again" described a reference to post-arrest silence as "innately prejudicial," such a reference, he continues, requires reversal "unless the prosecution demonstrates beyond a reasonable doubt that something in the record cured the prejudice." (*Id*. at 27 (emphasis omitted).)  Rivera contends that using *Adams* and *DiNicola* to say that a reference to post-arrest silence yielded "de minimis, if any, prejudice," as the Superior Court did here, is incorrect because, again, a reference to post-arrest silence is in his view presumptively prejudicial. (*Id.* at 29-30.)

To illustrate this, he points to *Commonwealth v. Costa*, 742 A.2d 1076 (Pa. 1999), which he claims roughly mirrors the facts of this case.  *Costa* was a sexual abuse case, without physical evidence, and the defendant testified in his own defense.  There, he notes, we deduced that credibility was "pivotal" to the outcome of the trial and ultimately found that a single comment regarding post-arrest silence constituted reversible error, stressing in particular that it "undermined [the defendant's] credibility" and gave the "[j]urors . . . the opportunity to have concluded that[,] if the [defendant] were not guilty, he would not have waited until trial to assert his innocence." (*Id.* at 32 (emphasis omitted) (quoting *Costa*, 741 A.2d at 1078).)  He then cites several other of our cases on the subject of credibility, noting we "recently" reaffirmed that when "'the jury [is] faced with a question of credibility,' it is impossible to say that the admission of evidence that should have been excluded was harmless." (*Id.* at 33 (quoting *Commonwealth v. Fulton*, 179 A.3d 475, 495 (Pa. 2018)).)

Another important lesson to draw from these cases, Rivera continues, is the fact of a split verdict.  In *Turner*, for example, he notes that we characterized a split verdict as a "compromise verdict" and reasoned that "[t]he jury may have decided that the Commonwealth's case was significantly bolstered by the reference to . . . post-arrest

silence." (*Id.* at 35 (quoting *Turner*, 454 A.2d at 540).) He also points out that we granted a new trial in *Turner* despite the fact that case involved a single question about post-arrest silence—a question that was unanswered, withdrawn, and followed by a detailed cautionary instruction. (*See id.* at 36.) In all then, Rivera renews his claim that the four questions here were not harmless beyond a reasonable doubt and asserts that he is entitled to a new trial.

The Commonwealth first requests we dismiss this appeal as improvidently granted. Conceding the Superior Court wrongly "cit[ed] a pre-arrest case, . . . *Adams*," it suggests the court "did in fact conduct a post[-]arrest analysis." (Commonwealth's Br. at 11 (quoting *Rivera*, 255 A.3d at 506 ("Where a trial court has erroneously admitted evidence of *post-arrest silence*, we may find that no new trial is warranted if we are convinced the error was harmless beyond a reasonable doubt." (emphasis added))).) The Commonwealth also asks us to dismiss the appeal because, in its view, defense counsel's lone and brief objection did not preserve the matter for appeal.

The Commonwealth notes that, in *Turner*, this Court "found that the prejudice to a defendant resulting from reference to [the defendant's] post-arrest silence [was] substantial," yet it still "applied a harmless error analysis." (*Id.* at 14.) Further, the Commonwealth notes that in *Commonwealth v. Spotz*, 870 A.2d 822 (Pa.), *cert. denied*, 546 U.S. 984 (2005), we "rejected" the idea that such references are "innately prejudicial," the same as we did in *DiNicola*. (*Id.* at 15 (quoting *Spotz*, 870 A.2d at 833-34).) Lastly, the Commonwealth cites *Commonwealth v. Mitchell*, 839 A.2d 202 (Pa. 2003), for the notion that "an improper reference to" post-arrest silence "may be deemed harmless if it did not contribute to the verdict." (*Id.*) On the merits, the Commonwealth argues that the error was harmless for the same reasons the Superior Court cited—*i.e.*, because the reference was contextual and brief and rebutted the inference that police "failed to

interview" Rivera, the prosecutor did not reference Rivera's silence ever again during the trial, and Rivera's silence was not used "as substantive evidence of guilt." (*Id.* at 16.)

## II.

Undeniably, the four questions the prosecutor asked here related to Rivera's post-arrest, post-*Miranda* silence. The inquiry was not a one-off, unfocused, slip-of-the-tongue affair; the prosecutor hammered the point four times in four ways.[4] If there was any doubt that these questions focused on the post-arrest period, the prosecutor removed such doubt at the outset of re-direct.[5] Thus, the parties agree, and we with them, that the inaugural error below was the use of pre-arrest silence cases like *Adams* to judge a post-silence case like the one at bar.

References to pre-arrest silence, on the one hand, seem to raise difficult and somewhat unresolved questions of law. Our decision in *Adams* is representative of some of these dilemmas. In *Adams*, as the Superior Court noted, the prosecutor asked a detective if he tried to speak to the defendant during the pre-arrest investigation. The detective said, "Yes[,] we did; however, he didn't want to speak to us." *Adams*, 104 A.3d at 513. After stating he identified himself as law enforcement, the prosecutor followed up: "[I]n response . . . what did [the defendant] say?" and the detective replied, "He said he had nothing to say." *Id.* Defense counsel objected, contending these questions violated the defendant's right to remain silent—a deceptively simple objection that fractured this Court.

The opinion announcing the judgment of the Court, authored by Justice Baer, relied on a mix of state and federal law and concluded that a "mere reference to pre-arrest

---

[4] (*See* N.T., 8/7/2019, at 101 ("[1] After you read him his *Miranda* [w]arnings, he never told you that he didn't do anything to any of these kids? . . . [2] He never denied doing anything to— . . . [3] He never said[,] I didn't do this? . . . [4] What did he say?").)

[5] (*See* N.T., 8/7/2019, at 101 ("And was [Rivera] arrested based on the arrest warrant?").)

silence does not constitute reversible error where the prosecution does not exploit the defendant's silence as a tacit admission of guilt." *Id.* at 512-13. The prosecutor's questions, the opinion reasoned, did not violate this rule because they only contextualized the detective's pre-trial investigation for the jury; in particular, they helped to explain why law enforcement sought the defendant's DNA. But it was a "close[] case," the opinion admitted, especially because the second question brought up the defendant's "refusal to speak to the detectives despite being aware that they were law enforcement personnel." *Id.* at 517-18. Thus, the opinion "caution[ed] prosecutors to tread carefully when referencing a defendant's refusal to speak to officers, limiting such reference to the description of the investigation or other relevant purpose." *Id.* at 518. Finding no error, the opinion did not reach the question of harmlessness.[6] *See id.* at 515 n.5.

---

[6] The responsive opinions show the variety of not unreasonable views this subject tends to elicit. Chief Justice Castille concurred in the result but would have reached it on the grounds that the case "involve[d] a pre-arrest scenario" and so, in his view, the questions "did not impinge upon [the defendant's] constitutional rights, irrespective of whether the prosecution later exploited the reference." *Adams*, 104 A.3d at 518 (Castille, C.J., concurring). Justice Saylor dissented. He critiqued the opinion announcing the judgment of the Court's partial reliance on federal law, because he reasoned that Article I, Section 9 of the Pennsylvania Constitution "provides greater protection" than the Fifth Amendment to the United States Constitution. *Id*. at 518 (Saylor, J., dissenting). Nor was he persuaded by the "opinion's reliance on an exception pertaining to evidence introduced for another purpose, such as explaining the sequence of the investigation." *Id.* Indeed, he opined, "I find such a proposition to be a mere pretext," as the police would have sought to obtain the defendant's DNA "even if he had affirmatively professed his innocence," thereby rendering the pre-arrest silence questions irrelevant and unnecessary. *Id*. at 518-19. Finding the testimony violated Article I, Section 9, Justice Saylor would not have found it harmless, as the prejudice was not minor and he was not convinced there was overwhelming, uncontradicted evidence of guilt—*i.e.*, the defendant's alibi defense contradicted "all of the testimony from the Commonwealth's witnesses placing [him] at the scene of the crime." *Id*. at 520. Justice Todd likewise dissented. She stated: "I would not address whether the Fifth Amendment applies in the instant context, because, as Justice Saylor explains, Article I, Section 9 of the Pennsylvania Constitution provides greater protection and precludes the prosecution's use of an accused's silence, except in certain limited circumstances not implicated herein." *Id*. at 520-21 (Todd, J., dissenting). In addition, Justice Todd stressed that the defendant "did not testify or otherwise raise any issue upon which his silence had (continued…)

This Court's decision in *Commonwealth v. Molina*, 104 A.3d 430 (Pa. 2014) (plurality), issued the same day as *Adams*, likewise involved pre-arrest silence, and likewise divided this Court. Acting on a lead that the defendant was holding a victim against her will, the detective traveled to the defendant's house, spoke with a resident who said the defendant was not there, and left his contact information. The detective and the defendant later spoke briefly over the phone, and the detective recounted this conversation at trial: "I asked him if he could come into our office and sit down and talk with me about the case, and he refused. He said he refused to come in." *Id.* at 433. Defense counsel did not object to this testimony, but when the prosecutor "accentuated [the] [d]efendant's refusal to go to the police station" during closings, defense counsel objected. *Id.* The prosecutor responded, "there's a sharp line drawn between pre-arrest silence and post-arrest silence." *Id.* at 434. The trial court judge agreed and overruled the objection. Again, this Court splintered.

The opinion announcing the judgment of the Court, also authored by Justice Baer, began by discussing *Salinas v. Texas*, 570 U.S. 178 (2013), a then-recent pre-arrest silence case which fractured the United States Supreme Court.[7] The opinion observed

---

significant probative value, and, thus, the privilege against self-incrimination under our charter precluded the Commonwealth from using that silence at trial." *Id*. at 521. Like Justice Saylor, Justice Todd would have found that "the Commonwealth's use of [the defendant's] pre-arrest silence may well have affected the jury's verdict and, thus, warrants retrial." *Id*.

[7] Summarizing *Salinas*, the opinion announcing the judgment of the Court noted:

> Three justices in the lead opinion did not speak to the use of pre-arrest silence as substantive evidence and instead dismissed [the defendant's] claims because he did not expressly invoke the privilege against self-incrimination. . . . Two concurring justices did not address the issue of express invocation but opined that [the defendant's] claim would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating

(continued…)

that "the constitutionality of the use of pre-arrest silence as substantive evidence has [also] split the federal circuit courts and state courts," so the opinion looked to our state constitution for an answer. *Molina*, 104 A.3d at 441. After a thorough analysis of state constitutional principles and Pennsylvania history, the opinion found that Article I, Section 9 of the Pennsylvania Constitution provides more protection than the Fifth Amendment to the United States Constitution on this issue and prohibits the use of pre-arrest silence as substantive evidence of guilt. Nonetheless, the opinion noted that pre-arrest silence may be admissible in certain circumstances to "impeach [a] testifying defendant with his prior statements, actions, or silence," as well as for purposes of the "fair response" doctrine. *Id.* at 447, 451. Ultimately, the opinion reasoned that the prosecutor in *Molina* used the questions above to exploit the defendant's pre-arrest silence as substantive evidence of guilt; that the testimony was, therefore, admitted in error; and that it was not harmless. Accordingly, the opinion announcing the judgment of the Court awarded a new trial.[8]

Another case cited by the Superior Court, *DiNicola*, also involved pre-arrest silence, but, unlike *Adams* and *Molina*, arose on collateral review. Defense counsel

---

testimony. Finally, four dissenting justices determined that no ritualistic language was needed to invoke the right against self-incrimination.

*Molina*, 104 A.3d at 438 (citations omitted) (internal quotation marks omitted).

[8] Justice Saylor, joined by Justice Todd, concurred, joining the lead opinion "subject to a few modest departures." *Molina*, 104 A.3d at 455 (Saylor, J., concurring). For one, Justice Saylor wrote to reiterate that our constitution forbids any reference to a defendant's "pre-arrest silence as substantive evidence of guilt regardless of whether an invocation may be discerned." *Id.* at 456. In addition, Justice Saylor was not sure, if it was a question of first impression, that he would "support the notion" that Pennsylvania recognizes an impeachment exception to the use of pre-arrest silence. *Id.* Chief Justice Castille and Justice Eakin dissented; the former viewed the question not as constitutional but evidentiary in nature, *see id.* at 460 (Castille, C.J., dissenting), while the latter stressed "this was not just a pre-arrest scenario—this was a pre-discovery-there-was-even-a-crime scenario." *Id.* at 464 (Eakin, J., dissenting).

asked a detective "a series of leading questions implying [the detective's] investigative efforts were minimal and/or one-sided," which led to the detective explaining on cross-examination that the defendant refused to speak to him during his pre-arrest investigation. *DiNicola*, 866 A.2d at 331-32. Upon review, this Court concluded that defense counsel did not provide ineffective assistance for failing to object to such testimony, noting that "the Commonwealth's elicitation of the [detective's] testimony regarding this fact constituted fair response." *Id.* at 336. The next question was whether defense counsel provided ineffective assistance by opening the door to the testimony. *See id.* ("[T]his claim of ineffectiveness can be definitively resolved by going directly to a consideration of prejudice."). It was in this context, clearly linked to the resolution of this collateral claim, that we stated: "[T]he mere revelation of silence does not establish innate prejudice."[9] *Id.* at 336-37. Ultimately, we reasoned: "Taken at face value, the revelation of silence in this case was limited to its context. . . . [T]he reference to silence . . . was circumspect; it was not used in any fashion that was likely to burden [the defendant's] Fifth Amendment right [under the United States Constitution] or to create an inference of an admission of guilt." *Id.* at 337. Thus, as we were not convinced that the absence of defense counsel's questions regarding the detective's pre-arrest investigation would have changed the outcome of the trial, we denied collateral relief. *See id.*

This Court, it seems, has struggled to create a uniform rule to govern references to pre-arrest silence (as have many other courts). We need not square the circle here.[10]

---

[9] The Commonwealth cites this sentence in its brief, and both courts below cited it in their opinions. This sentence has little, if any, relevance here. As its context shows, it arose in a pre-arrest silence case couched in the posture of collateral review. It should stay confined to that context and not extended to direct appeal, post-arrest cases like this one.

[10] We appreciate the defendant's well-researched attempt to set forth a tidy harmless error rule to solve the pre-arrest silence conundrum. But as pre-arrest silence is not before the Court, this is not the occasion to opine, but in *dicta*, any more on such a rule.

We discuss *Adams*, *Molina*, and *DiNicola* only to show all three unmistakably involved facts relating to pre-arrest silence and to say the Superior Court erred in bringing this batch of cases to bear here. As the prosecutor in *Molina* aptly put it, there is a "sharp line" bisecting harmless error review of testimonial references to pre- and post-arrest silence.[11]

The comparative age and the volume of state and federal precedent dealing with both types of references attests to this bisection. This Court, for instance, addressed post-arrest silence twenty-four years before we first addressed pre-arrest silence. As the post-arrest silence case law has developed, courts over the years have set forth a variety of rationales to explain the proscription. Some verge on the psychological. We need not recount them all here. For now, it seems sufficient to say, as this Court repeatedly has, that most jurors, most lay people, probably suppose that a truly innocent man would deny the charges upon his arrest.[12] Hearing a defendant did not so deny, but instead stayed

---

[11] Although not cited by the parties, *Commonwealth v. Bolus*, 680 A.2d 839 (Pa. 1996), was the first decision from this Court to address pre-arrest silence and contains an interesting discussion on the matter. *See Bolus*, 680 A.2d at 842-845 (finding rationale in *Jenkins v. Anderson*, 447 U.S. 231 (1980) "both instructive and persuasive" and determining that in certain circumstances Commonwealth may use pre-arrest silence to impeach testifying defendant).

[12] Admittedly, the idea that an innocent person would deny the charges against them at the first opportunity to do so has not been uniformly embraced by the courts, at least not in all contexts. *Doyle v. Ohio*, 426 U.S. 610 (1976), for instance, used the phrase "insolubly ambiguous" to describe the nature of an accused's silence in the face of the *Miranda* warnings. *Doyle*, 426 U.S. at 617. Another jurist was wary of generalizations one way or the other. *See United States v. Hale*, 422 U.S. 171, 181 (Burger, C.J., concurring) ("It is no more accurate than to say, for example, that the innocent rather than the guilty are the first to protest their innocence."). The late Justice Musmanno, in rejecting the "tacit admission rule" in Pennsylvania, likewise seemed to view silence as a quandary:

> Who determines whether a statement is one which 'naturally' calls for a denial? What is natural for one person may not be natural for another. There are persons possessed of such dignity and pride that they would treat

(continued…)

silent, the logic goes, may lead the jury to conclude or infer the defendant must be guilty. The problem with this, as this Court has historically viewed it, is that it effectively penalizes a defendant for exercising a right that the drafters of the Pennsylvania and United States Constitutions alike "deemed worthy of enshrinement." *Grunewald v. United States*, 353 U.S. 391, 426 (1957) (Black, J., concurring). In total then, while the law concerning pre-arrest silence may be in some flux, we reaffirm the penalty rationale, as developed by the common law, as a sound (though not exclusive) basis to explain why references to post-arrest silence are proscribed. *Accord, e.g., Commonwealth v. Easley*, 396 A.2d 1198, 1202 (Pa. 1979) ("To approve the prosecutor's comment . . . would

---

with silent contempt a dishonest accusation. Are they to be punished for refusing to dignify with a denial what they regard as wholly false and reprehensible?

. . . .

It may be desirable and dramatic for the wrongly accused person to shout: 'I am innocent!' but not everybody responds spontaneously to stimuli. The accusation may be so startling that the accused is benumbed into speechlessness. There are persons so sensitive and hurt so easily, that they swallow their tongue in the face of overwhelming injustice.

*Commonwealth v. Dravecz*, 227 A.2d 904, 906-07 (Pa. 1967) (plurality). The late Justice Musmanno further observed:

In his funeral oration on Roscoe Conkling, Robert G. Ingersoll said: 'He was maligned, misrepresented, and misunderstood, but he would not answer. He was as silent then as he is now—and his silence, better than any form of speech, refuted every charge.' George Bernard Shaw said: 'Silence is the most perfect expression of scorn.' The immortal Abraham Lincoln summed up his philosophy on this subject in characteristic fashion: If I [were to try to] read[,] much less answer, all the attacks made upon me this shop might as well be closed for any other business.

*Id.* at 906 n.1.

penalize [the defendant] for exercising his constitutional privilege against self-incrimination.").[13]

For more than half a century, relying in part on the train of thought sketched in rough outline above, this Court has repeatedly signaled to the Commonwealth that referencing a defendant's post-arrest silence may imperil an entire case. In fact, as

---

[13] We note that the rationale that failing to protect post-arrest silence penalizes individuals exercising their right to remain silent seems to be more a creature of common law than something so stringently derived from the text of the self-incrimination clause. Some jurists have asked, for instance, how a defendant is "compelled . . . to be a witness against himself" via a reference to silence; it seems the same could be asked with respect to Article I, Section 9 of the Pennsylvania Constitution. *See generally Salinas*, 570 U.S. at 191-93 (Thomas, J., concurring). Others have emphasized the right against self-incrimination was derived from the common law principle (embraced by William Penn, *see* Milton Cantor, *Origins of the Fifth Amendment* [], 117 Penn. L. Rev. 498, 505 (1969)) of *nemo tenetur seipsum accusare* (loosely "no man is bound to accuse himself") and was included in the founding documents to forbid physical torture and compulsory testimony not for psychological theories about what a jury may make of a reference to at-trial or post-arrest silence. *See* Mark A. Godsey*, Rethinking the Involuntary Confession Rule: Toward a Workable Test for Identifying Compelled Self-Incrimination*, 93 Cal. L. Rev. 465, 480 (2005) ("[T]he doctrine of [n]emo tenetur and its abhorrence of the government use of torture and coercive interrogation techniques drove the self-incrimination clause's ultimate inclusion in the Bill of Rights."). Nevertheless, this Court and the United States Supreme Court have long embraced the "penalty" rationale (originally to bar comments on a defendant's decision not to testify and then in many other contexts, including the one here) to the point where it seems to have become a touchstone of American law. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (stating comment on defendant's decision not to testify is "a penalty imposed by courts for exercising a constitutional privilege"); *Gillison v. United States*, 399 F.2d 586, 588 (D.C. Cir. 1968) (extending *Griffin* to post-arrest silence); *Haideman*, 296 A.2d at 766-67 (endorsing that extension in Pennsylvania); *In re Silverberg*, 327 A.2d 106, 111 (Pa. 1974) (explaining how basic gist of Justice Black's concurrence in *Grunewald* motivated full Court in *Griffin*); *Molina*, 104 A.3d at 446 ("Since *Griffin,* the protection of a defendant's silence has become imbedded in our jurisprudence."). Indeed, not even those who hold a more textualist position would seem to propose that the idea be overruled. *See, e.g., Mitchell v. United States*, 526 U.S. 314, 330 (1999) ("Principles once unsettled can find general and wide acceptance in the legal culture, and there can be little doubt that the rule prohibiting an inference of guilt from a defendant's rightful silence has become an essential feature of our legal tradition."); *id.* at 332 (Scalia, J., dissenting) ("Although the latter assertion strikes me as hyperbolic, the former may be true—which is adequate reason not to overrule these cases, a course I in no way propose.").

Rivera correctly notes, we have often deemed a single such reference—answered or not, curative instruction or not—offensive enough to the constitution and the principles it embodies as to call for a new trial.

This line of post-arrest silence cases begins fifty-one years ago with *Haideman*. There, the prosecutor asked the arresting officer, "When the constitutional rights [*i.e., Miranda* rights] were read to the defendant, did [he] say anything?" and the officer replied: "He didn't say nothing; he calmed down[,] and he shut up." *Haideman*, 296 A.2d at 766. The trial court judge overruled a defense objection and denied a motion for a mistrial. Later, another officer took the stand and mentioned the defendant's post-arrest silence. Initially, we stated: "Testimonial reference to an accused's silence . . . at [the] time of arrest is . . . constitutionally impermissible." *Id.* Being the first Pennsylvania case on the subject, we quoted various federal court decisions noting, for example, that such references "reduce[] to a hollow mockery" the right to remain silent, lead a jury "to infer guilt," present a defendant with a Catch-22 of "[y]ou have the constitutional right to remain silent, but if you exercise it, that fact may be used against you," and "penalize" a defendant for exercising his constitutional rights. *Id*. at 767-68 (citations omitted). Indeed, we noted *Miranda* itself forbids the prosecution from "introduc[ing] at trial the fact that the accused 'stood mute or claimed his privilege.'" *Id*. at 768 (quoting *Miranda*, 384 U.S. at 468 n.37). It "must" be held, we concluded, that prosecutorial reference to a defendant's post-arrest silence is "reversible error," for to hold otherwise "would certainly impair and burden [a defendant's] constitutional privilege." *Id*. Thus, we granted the defendant a new trial.

Next, in *Commonwealth v. Greco*, 350 A.2d 826 (Pa. 1976), the prosecutor asked an officer, "[d]id [the defendant] ever say anything to you?" and the officer replied, "[w]e had several conversations. I advised him . . . that he had the right to remain silent, and he didn't actually make any statements other than general conversation." *Id*. at 827-28.

We reiterated:  "The law is clear.  It is reversible error to admit evidence of a defendant's silence at the time of his arrest."  *Id*. at 828.  This rule, we explained, "reflects the [C]ourt's desire that an accused not be penalized for exercising his constitutional right[]" to remain silent.  *Id.*  Rejecting an argument that the prosecutor did not intend to cause prejudice, we noted prejudice in these settings does not depend on prosecutorial intent but is rooted in the idea that "[l]ay persons might conclude that the natural reaction of an innocent person would be a denial of any involvement in the crime charged."  *Id*.  The "failure to deny," we noted, "might thus be considered an unnatural reaction unless the accused was in fact guilty."  *Id*.  Testimony regarding post-arrest silence also "implies an admission of guilt."  *Id.*  "An admission of guilt," we continued, "constitutes highly prejudicial evidence and cannot be considered harmless error."  *Id*.  Again, we awarded the defendant a new trial.

In *Commonwealth v. Singletary,* 387 A.2d 656 (Pa. 1978), and like *Greco*, at issue was a single question—one the prosecutor asked a testifying defendant:  "And on advice of counsel, you made no statement concerning the case[?]"  *Singletary*, 387 A.2d at 656.  We began by stressing "[i]t is a violation of the accused's constitutional privilege against self-incrimination to make reference to his silence while in police custody" because, as we noted in *Haideman* and *Greco*, such references "penalize" a defendant for exercising his constitutional right to remain silent.  *Id.* at 656-57.  Although not conducting a formal harmless error analysis, we did at least consider in *Singletary* whether a curative instruction from the trial court could stave off a mistrial.  We ultimately found it could not; emphasizing, again as we did in *Haideman* and *Greco,* that "a lay person could and probably would consider this silence to be an unnatural reaction unless the accused was in fact guilty."  *Id.* at 657.  As such, and once more, we granted a new trial.

Next in this line is our seminal *Turner* decision. There was conflicting evidence in *Turner* as to whether "the gun was fired during the course of a struggle" or whether the defendant "stood over" the victim and shot him with intent. *Turner*, 454 A.2d at 538. The defendant testified in his own defense and maintained the shooting was in self-defense. During cross-examination, the defendant said he saw the victim shooting at him, prompting the prosecutor to ask: "Did you ever tell the police that somebody was shooting at you?" *Id.* Defense counsel objected before the defendant answered and, at a subsequent sidebar, moved for a mistrial. The trial court judge denied the motion, opting instead, after a sidebar, to give a lengthy curative instruction.[14] Ultimately, the jury delivered a split verdict—it acquitted on murder but found the defendant guilty of manslaughter.

As in *Haideman*, *Greco*, and *Singletary*, we awarded the defendant in *Turner* a new trial. "It is clear," we began, "that 'the privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury,'" and we stressed that "[t]he prejudice to the defendant resulting from reference to his silence is substantial." *Id.* at 539 (quoting *Haideman*, 296 A.2d at 767). While it may be "efficacious" trial work for the

---

[14] The instruction was as follows:

> Ladies and gentlemen of the jury, I told you at the beginning of this trial, when I gave preliminary instructions, the only evidence you are to consider when you deliberate as to your verdict is what you hear from this witness stand. I told you specifically, as I recall, and I reiterate it now, that questions asked by either of the lawyers or even the court are not evidence. A question was just asked before we went to sidebar by the Assistant District Attorney for this witness, the defendant. It has not been answered. It was objected to, I sustained the objection, and that means you are to disregard that question, or I say to you now you are to disregard that question entirely, as though it had never been asked.

*Turner*, 454 A.2d at 538 n.2.

Commonwealth to "uncover a fabricated version of events" from the defendant to later impeach him at trial, given what *Doyle* called the "'insolubly ambiguous' nature of silence," we stated that the Commonwealth "must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial." *Id*. (quoting *Doyle*, 426 U.S. at 617). In theory, we noted, post-arrest silence could be used if the defendant says at trial that he spoke to police when he did not, but otherwise, we repeated that a defendant may not be penalized "for exercising the right to remain silent." *Id*. at 540. We also held that for purposes of Pennsylvania law the timing of the *Miranda* warnings is not dispositive. *See id.* Finally, we declined to find the error harmless, stressing in particular the fact of a split verdict:

> In order to draw conclusions from the verdict about what the jury believed, the Commonwealth's hypothesis about the jury's state of mind would have to be a necessary and sufficient explanation of the verdict. But the most obvious of alternative explanations presents itself: the jury may have delivered a compromise verdict. The jury may have decided that the Commonwealth's case was significantly bolstered by the reference to [the defendant's] post-arrest silence and that it would be appropriate to impose a verdict more severe than acquittal but less severe than murder. Verdicts are arrived at after many objective and subjective considerations and do not always conform perfectly to the instructions given by the court. Thus, no sound conclusions can be drawn from the verdict about what the jury believed concerning [the defendant's] credibility. To attempt to draw such conclusions is to speculate. As we cannot be sure that the jury would have resolved the issue in the same manner absent the improper reference, we are not convinced beyond a reasonable doubt that the error did not contribute to the verdict. Far from being harmless error, the reference may well have impermissibly contributed to the verdict.

*Id*. (citation and internal quotation marks omitted).

The most recent post-arrest silence, direct appeal case is *Mitchell*. There, the prosecutor asked the testifying defendant questions concerning both his pre-arrest and post-arrest silence. *See Mitchell*, 839 A.2d at 211-12. Noting that "[f]ollowing *Turner*, this

[C]ourt has been consistent in prohibiting the post-arrest silence of an accused to be used to his detriment," we reasoned that one of the questions—"[I]sn't it correct that this is the first time . . . that you ever told anybody publicly who killed your two cousins?"—violated *Turner* because it "anticipated an answer that would embrace [his] actions from the moment of the shooting through the time of his arrest and up until the day of trial." *Id.* at 213-14. Still, and even without advocacy from the Commonwealth, *see id*. at 215 n.11, we found the error harmless because "uncontradicted" evidence established, *inter alia*, that the defendant was at the scene of the crime at the time of the shooting.[15] *Id*. at 215.

_____

[15] In finding harmlessness based on "uncontradicted" evidence, the *Mitchell* Court did not use the second modifier always attached to this test: "overwhelming," which prompted a strong dissent from Justice Saylor. *See Mitchell*, 839 A.2d at 217 (Saylor, J., dissenting). He also assailed the majority's "single-sentence comparative assessment concerning the impact of the prosecutor's reference" which, in his view, ignored "this Court's past recognition of the substantial potential for prejudice associated with silence in the face of confrontation with alleged criminal conduct." *Id.* at 218. He then made several points Rivera makes in his brief about how too easily finding constitutional violations harmless can erode substantive rights. *Compare id.* (pointing to Harry Edwards, *To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. Rev. 1167 (1995) for the idea that too willy-nilly a harmless error analysis may have "substantial consequences . . . in terms of the erosion of constitutional rights"), *with* (Appellant's Br. at 39-44 (discussing how "undermining the harmless error rule undermines substantive protections").) Although three cases from this Court in the 1990's found that a mention to post-arrest silence did not warrant a new trial, none of them, like *Mitchell*, expressly found a *Turner* violation. *See Commonwealth v. Crews*, 640 A.2d 395, 404-05 (Pa. 1994) (noting reference to post-arrest silence arose in extradition context—context "not familiar to most citizens" and "not one in which jurors would equate invocation of Fifth Amendment rights with an implicit admission of guilt"); *Commonwealth v. Ragan*, 645 A.2d 811, 827 (Pa. 1994) (finding questions distinct from *Turner* because did not "specifically mention" whether defendant had spoken to police, word "dawn" hinted not "to speech at all, but rather, deals with [the defendant's] cognitive process," question was "ambiguous" as to pre- versus post-arrest period, and trial court gave "thorough" cautionary instruction); *Commonwealth v. Nolen*, 634 A.2d 192, 197 (Pa. 1993) (determining that question— "[p]rior to your testimony here in this courtroom today, however, you have not testified yourself, have you?"—was permissible as "significance of this line of questioning was clear; it was an attempt on the part of the Commonwealth to establish the opportunity of [the defendant] to tailor his testimony in accord with what had already been testified in a manner that would benefit him" and, thus, did not violate *Turner*). Whatever problems there may be with *Mitchell*, we need not overrule it at this juncture because, as discussed (continued…)

All said, testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution. Here, the four questions-and-answers about Rivera's post-arrest, post-*Miranda* silence violated this fundamental rule; as we have said before, they reduced his right to remain silent to a "hollow mockery," *Haideman*, 296 A.2d at 767, "implie[d] an admission of guilt," *Greco*, 350 A.2d at 828, and created an illusion that he "was in fact guilty." *Singletary*, 387 A.2d at 657. By telling the jury that he "stood mute or claimed his privilege" after his arrest, the Commonwealth ultimately caught him in that disallowed Catch-22—"[y]ou have the constitutional right to remain silent, but if you exercise it, that fact may be used against you." *Miranda*, 384 U.S. at 468 n.37; *Haideman*, 296 A.2d at 768 (citation omitted). In short, these references penalized Rivera for exercising his right to remain silent and were, therefore, a "constitutionally impermissible" infringement on that right. *Turner*, 454 A.2d at 540; *Haideman*, 296 A.2d at 766.

Nor can these questions-and-answers be saved by the "fair response" doctrine. As the Superior Court correctly and ably explained, questions about pre-arrest silence (such as those defense counsel asked on cross-examination) do not open the door for the Commonwealth to ask questions about post-arrest silence (which the prosecutor's questions on re-direct here clearly were). Furthermore, because Rivera did not testify that he spoke to police after he was arrested when he in fact did not, these questions cannot meet the (theoretical) *Doyle* exception. *See Doyle*, 426 U.S. at 619 n.11; *Turner* 454 A.2d at 539-40. Lastly, as this is a direct appeal, *Pierce* and the added layers that attend to collateral appeals are immaterial.[16]

---

below, we find it distinguishable from the instant case in terms of the harmless error analysis.

[16] In their briefs, both parties rely on post-arrest silence cases that arose in the context of collateral claims—*i.e.*, ineffective assistance of counsel. (*See* Appellant's Br. at 27, 31 (continued…)

Although the Superior Court rightly found that the disputed testimony here was admitted in error, it then incorrectly relied on pre-arrest silence cases to conclude that the error was harmless because Rivera suffered, at most, minor prejudice. Mischaracterizing *Adams* as a post-arrest silence case, as Rivera accurately pinpoints, seems to have

(citing *Clark*, 626 A.2d 155, and *Costa*, 742 A.2d 1076); Commonwealth's Br. at 15 (citing *Spotz*, 870 A.2d 822).) The courts below fell victim to the same imprecise reliance. *See Rivera*, 255 A.3d at 507 (citing *Whitney*, 708 A.2d at 478). It seems that there may be some disharmony across these cases. The "innately prejudicial" language in *Clark*, for example, seems hard to square with the "more exacting" language in *Spotz* and the "explicit reference" language in *Whitney*. *Compare Clark*, 626 A.2d at 157-58 n.7 ("[A]n impermissible reference to an accused's post-arrest silence constitutes reversible error unless shown to be harmless. Restated, we have concluded that because of its nature, an impermissible reference to the accused's post-arrest silence is innately prejudicial" and specifically declin[ed] to conduct a harmless error or prejudice analysis because "there is no question that the impermissible reference to a criminal defendant's post-arrest silence is prejudicial"), *with Spotz*, 870 A.2d at 834 ("[T]he test for prejudice in the ineffectiveness context is more exacting than the test for harmless error."), and *Whitney*, 708 A.2d at 478 ("Even an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt."). In any event, when read in the context of each case, it is clear these sentences are referring to "prejudice" in the context of a collateral claim of ineffective assistance of counsel. Notably, as to such claims, the defendant bears the burden and must prove that, "but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Spotz*, 870 A.2d at 830. This case, in contrast, comes to us on direct appeal, where the burden is on the Commonwealth to prove beyond a reasonable doubt that the error was harmless. *Mitchell*, 839 A.2d at 214-15. At this juncture, then, we note this procedural distinction; caution that *Costa, Clark*, *Spotz*, and *Whitney* should stay cabined to the context of collateral claims; and leave resolution of whatever tension there may be in these cases addressing collateral claims for a post-arrest silence case which arises in the context of such a claim.

irrevocably poisoned this conclusion.  We, therefore, turn to the question of harmless error ourselves.[17],[18]

## III.

Initially, we agree with Rivera that the violation here cannot be set aside by the first prong of *Hairston*.  *See Hairston*, 84 A.3d at 671 (allowing harmlessness finding where "the error did not prejudice the defendant or the prejudice was de minimis" (quoting *Hawkins*, 701 A.2d at 507)).  None of the factors that the Superior Court used in this case to support this conclusion are germane, as they were all derived from inapplicable authorities.  It is true, as the Commonwealth notes, that the Superior Court at times

---

[17] We recognize the question accepted for review hints at both state and federal law.  As this Court has often interpreted Article I, Section 9 of the Pennsylvania Constitution to supply weightier armor than the Fifth Amendment to the United States Constitution in this area, it seems unnecessary to discuss whether the comments also violated the Fifth Amendment.  *See Molina*, 104 A.3d at 443 ("[W]e have previously found [Article I,] Section 9 to provide greater protection than the Fifth Amendment."); *Adams*, 104 A.3d at 520-21 (Todd, J., dissenting).  Indeed, the extent of these protections is even more pronounced in the post-arrest silence context.  *Compare, e.g., Fletcher v. Weir*, 455 U.S. 603, 605-07 (1982) (declining to extend *Doyle* due process rationale to post-arrest but pre-*Miranda* period) with *Turner*, 454 A.2d at 540 (rejecting *Fletcher* in favor of a "more restrictive" position).  Furthermore, while the defendant discusses the federal regime, the majority of his brief relates to our law, as does the entirety of the Commonwealth's brief.

[18] We do not necessarily disagree with the Commonwealth that defense counsel could have done more here.  He could have, as counsel did in *Turner*, called for a sidebar, requested a curative instruction, or moved for a mistrial.  Nevertheless, it would be an odd posture to require a litigant, having lost an objection, to then demand a curative instruction or move for a mistrial in order to stave off waiver.  More significantly, it would be in tension with the Rules of Evidence.  *See, e.g.*, Pa.R.E. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection . . . to preserve a claim of error for appeal.").  (*See also* Appellant's Reply Br. at 2-5 (discussing waiver).)  Here, defense counsel timely objected to the prosecutor's question regarding Rivera's post-arrest, post-*Miranda* silence, and the trial court overruled that objection.  For this reason, and given that the grounds for the objection are evident from defense counsel's explanation and the context surrounding the objection as described previously, we are satisfied that the issue before this Court has been properly preserved in accordance with Pa.R.E. 103(a) (providing that claim of error in ruling to admit evidence is preserved if "a party, on the record[,] . . . makes a timely objection[] . . . and . . . states the specific ground, unless it was apparent from the context"), and Pa.R.E. 103(b).

appeared to correctly frame the case as one involving "post-arrest" and "post-*Miranda*" silence, *see Rivera*, 255 A.3d at 507-08, but it is apparent from the language the opinion uses (*e.g.*, "contextual and brief") and the cases it cites (*e.g.*, *Adams* and *DiNicola*) that the heart of the analysis rested on pre-arrest silence cases. There is no, for instance, citation to *Haideman*, *Greco*, *Singletary*, *Turner*, or *Mitchell*, further illustrating the misframing; for none of these cases contain language like "contextual and brief," "rebutted the inference" or "used as substantive evidence of guilt," all of which pertain to pre-arrest silence. For its part, the Commonwealth cites, point-for-point, the same elements on which the Superior Court relied. (*See* Commonwealth's Br. at 16 (reference was contextual and brief, rebutted idea police "failed to interview" defendant, prosecutor did not bring up issue during closings or otherwise, and reference not used "as substantive evidence of guilt").) Again, all of this relates to pre-arrest silence, so none of it supports the conclusion that the disputed testimony here worked but minor prejudice. We do not attach a descriptor like "innate" or "presumptive" to quantify the prejudice a reference to post-arrest silence yields—many phrases have been used and several could work: "constitutionally impermissible," *Haideman*, 296 A.2d at 766; "highly prejudicial," *Greco*, 350 A.2d at 828; "substantial," *Turner*, 454 A.2d at 539; "substantial potential" for prejudice, *Mitchell*, 839 A.2d at 218 (Saylor, J., dissenting). We do, however, agree with Rivera that the phrase "de minimis" should not be used; at least for purposes of the *Hairston* harmless error test and in situations where, as here, a defendant does not testify that he spoke to police after he was arrested.

With the first prong of *Hairston* out, so is the second, as the Commonwealth makes no argument that the error was "merely cumulative" of other evidence introduced at trial. *Hairston*, 84 A.3d at 671 ("[T]he erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted

evidence." (quoting *Hawkins*, 701 A.2d at 507)). As such, the only way that the Commonwealth can carry its burden of proving harmlessness is if it shows, beyond a reasonable doubt, that the third prong of *Hairston*—which requires that "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict"—has been met. *Id.* at 671-72 (quoting *Hawkins*, 701 A.2d at 507). We are not persuaded that the Commonwealth has carried this burden.

The Commonwealth's case rested almost entirely on the testimony of the four victims, Florencia, and to a lesser degree S.M.'s mother. Its remaining five witnesses either testified in generalities—such as Ms. Vandewark (the forensic interviewer), Ms. O'Connor (the nurse who examined the victims), and Trooper Higdon (who detailed his investigation)—or to information not necessarily essential to the allegations, including E.P. (C.P.'s father who stated in general terms that C.P. acted "weird") and Jared Smith (the paramedic who responded to the lollipop incident). Rivera's case-in-chief, as well, relied substantially on testimony—primarily from Katherin, who explained why she chose to testify for the defense, and from Rivera himself, who denied the allegations, developed the mother's possible motives to lie, and provided a partial alibi for some of the accusations. Viewing the record as a whole, we tend to agree with Rivera that the trial was a "credibility contest from the start" and that the jury "was faced with a question of credibility"—*i.e.,* whether to believe the victims and Florencia or Rivera and Katherin. (Appellant's Br. at 7); *Fulton*, 179 A.3d at 495.

Further, our review of the record reveals, as Rivera argues, that the defense "vigorously" challenged the credibility of several of the Commonwealth's witnesses, especially Florencia. (Appellant's Br. at 8.) In general, then, most of the relevant testimony from the Commonwealth's witnesses appears to have been "contradicted," if

not on cross-examination, then by Rivera's own case-in-chief. *Hairston*, 84 A.3d at 672. Under one of the central premises of the penalty rationale explained above, namely, that an innocent man would not remain silent upon his arrest but would assert his innocence, *see Greco*, 350 A.2d at 828, when the jury heard, four times, that Rivera did not deny his guilt, we cannot say, for sure, that this did not undermine his credibility. Particularly in view of the centrality of credibility to this case, it is not improbable that the admission of this testimony "might have contributed to the conviction." *Commonwealth v. Story*, 383 A.2d 155, 164 (Pa. 1978) (quoting *Commonwealth v. Davis*, 305 A.2d 715, 719 (Pa. 1973)). Moreover, setting aside the contested testimonial evidence, it is difficult to see "overwhelming" and uncontradicted evidence of Rivera's guilt here. *Hairston*, 84 A.3d at 672 (quoting *Hawkins*, 701 A.2d at 507); *contra Mitchell*, 839 A.2d at 214-15. In the context of this case, then, we cannot say beyond a reasonable doubt that "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Hairston*, 84 A.3d at 671-72 (quoting *Hawkins*, 701 A.2d at 507). Because none of the three *Hairston* prongs are met, we conclude that the allowance of the constitutionally impermissible testimony here was not harmless.

Two other factors support our conclusion. The first factor being the absence of a sufficient curative instruction. *See Story*, 383 A.2d at 165 n.18 ("One factor to be considered by an appellate court assessing the impact of an error is whether the trial court instructed the jury to disregard the information which was improperly brought to its attention. Adequate cautionary instructions may minimize the impact of an error so as to render it harmless."). Here, the only thing the trial court judge told the jury after allowing the disputed testimony was "[o]kay[,] and just to [defense counsel's] point, that is his right as a defendant, okay, [c]onstitutional [r]ight." (N.T., 8/7/2019, at 102.) It is hard to classify

this brief remark as "[a]dequate," *Story*, 383 A.2d at 165 n.18, especially when compared to the more thorough instruction this Court found inadequate in *Turner*, *see Turner*, 454 A.2d at 538 n.2.[19]  The second factor supporting our conclusion is the split verdict. We discussed what may be gleaned from a split verdict at some length in *Turner*, and we reaffirm that discussion here.[20]  *See id*. at 540.

In all, while the Commonwealth rightly notes the prosecutor did not bring the issue up at closings or otherwise, considering the constitutional right at stake; our case law; the

---

[19] The trial court gave "preliminary" and "concluding" instructions to the jury and suggested that both of these also allayed any potential prejudice.  (*See* N.T., 8/6/2019, at 6, and N.T., 8/8/2019, at 166.)  As to the preliminary instructions, we cannot locate a case endorsing the idea that an instruction given prior to unconstitutional testimony can be said to cure the prejudice of later-in-time testimony.  Further, our review of the concluding instructions cited above reveals phraseology in generalities that is not specifically tailored to address the error at issue.

[20] As a final matter, the second conjunctive part of prong three of the harmless error test provides that "*the prejudicial effect of the error was so insignificant* by comparison that the error could not have contributed to the verdict."  *Hairston*, 84 A.3d at 672 (emphasis added) (quoting *Hawkins*, 701 A.2d at 507).  Having found a constitutional violation, one of a not petty magnitude, it is difficult to understand how the same might ever be classified as "so insignificant."  *Id.*  Indeed, we do not take lightly Rivera's suggestion that too free a use of the harmless error doctrine in the constitutional setting can be a slippery slope. In a broader sense, we recognize that the concept of harmless error is, as former Chief Justice Robert Traynor of the California Supreme Court famously described it, a "riddle." *See, e.g., Story*, 383 A.2d at 168 ("What clues are there in cold print to indicate where the truth lies?  What clues are there to indicate where the half-truth lies?") (quoting Robert Traynor, *The Riddle of Harmless Error*, 20-21 (1970)).  As we succinctly said in *Story*:

> The harmless error rule derives from the notion that although an accused is entitled to a fair trial, he is not entitled to a perfect one.  The harmless error rule can save the time, effort, and expense of unnecessary retrials where the defendant has not been prejudiced by an error.  But courts must be careful in applying the harmless error rule, for if the violation of a rule is too readily held harmless, the importance and effectiveness of the rule is denigrated.

*Story*, 383 A.2d at 164 (citations omitted).  Few rules seem more important than constitutional ones.

repeated, intentional, and court-sanctioned nature of the inquiry; the centrality of credibility in this case; the extent to which these questions probably undermined Rivera's credibility; the lack of physical evidence; the absence of an adequate curative instruction and the split verdict, we reverse the judgment of the Superior Court in part and, as we did in *Haideman*, *Greco*, *Singletary*, and *Turner*, award Rivera a new trial.[21]

    Chief Justice Todd and Justices Donohue, Dougherty and Wecht join the opinion.

    Justice Wecht files a concurring opinion.

    Justice Mundy files a concurring and dissenting opinion.

---

[21] The Superior Court's judgment is reversed insomuch as it affirmed Rivera's convictions on the ground that Rivera was not entitled to a new trial based on the erroneous admission of evidence of Rivera's post-arrest, post-*cer* silence.  To the extent that the Superior Court rendered holdings on issues not before this Court, this Opinion does not disturb those holdings, though it does render moot that court's award of relief insofar as it granted a new trial and resentencing on grounds not addressed herein.